JAMES F. McKAY III, Chief Judge.
LSedrick Simms, appeals his convictions for armed robbery and possession of a fire arm by a convicted felon. We affirm the defendant’s convictions, vacate his sentences and remand the matter to the trial court for further proceedings consistent with this opinion.
STATEMENT OF CASE
On February 28, 2012, the defendant, Sedrick Simms (“defendant”), was charged by bill of information with one count of armed robbery with a firearm and one count of possession of a firearm by a convicted felon, in violation of La. R.S. 14:64.3 and La. R.S. 14:95.1, respectively. On March 5, 2012, he entered a plea of not guilty. He subsequently filed a motion to suppress identification and a motion for preliminary hearing. On May 4, 2012, the trial court found probable cause to substantiate the charges and denied the motion to suppress.
On August 20, 2012, the matter proceeded to trial. On August 21, 2012, the jury returned a verdict finding the defendant guilty of both charges. On August 22, 2012, the State filed a multiple offender bill of information pursuant to La. R.S. 15:529.1.[1]
|2On December 3, 2012, the defendant filed a motion for new trial and a motion for post-verdict judgment of acquittal. On December 12, 2102, the trial court denied both motions. On January 7, 2013, the trial court sentenced the defendant to thirty years for armed robbery with a firearm and twenty years for possession of firearm by convicted felon, to run concurrently, with credit for time served, without the *1261 benefit of probation, parole, or suspension of sentence. Thereafter, the State re-filed the multiple offender bill of information.
On March 12, 2013, the defendant filed a motion for appeal. The trial court granted the motion for appeal the same date and set the return date for May 28, 2013.
On April 12, 2013, a multiple offender hearing was held; the trial court adjudicated the defendant a double felony offender. The trial court vacated the thirty year sentence, originally imposed for armed robbery with a firearm, and sentenced the defendant to seventy years with the Louisiana Department of Corrections, with credit for time served, without benefit of probation, parole, or suspension of sentence. The twenty year sentence imposed on the defendant for his conviction of felon in possession of firearm remained. The defendant then orally moved for reconsideration of sentence, which the trial court denied.[2] On May 1, 2013, the record was lodged with this Court, but did not contain the |3transcript of the April 12, 2013 multiple bill hearing. On June 11, 2013, this Court received the missing transcript, completing the record for appeal.
STATEMENT OF FACT
The following evidence was adduced at trial.
In the early morning hours of January 2, 2012, after an evening of celebrating with friends on Bourbon Street, Dana Cur-rington (“victim”), was driven by a friend to her residence at 524 Austerlitz Street. When she arrived there she discovered that the screen door was locked; she knocked on the window to awaken her boyfriend who was asleep inside. She then waved to her friend acknowledging that she was safe. Immediately thereafter, she was accosted by Sedrick Simms, the defendant, who was armed with a 9 millimeter gun. He demanded that she give him her money. He took her purse; he fled down Austerlitz Street toward Annunciation Street where the victim saw him enter the side of a green house in the 3900 block of Annunciation Street. The victim called 911 to report the robbery. At around 5:30-6:00 a.m., New Orleans Police Department (“NOPD”) Officer Carlos Amador, arrived at the scene and took the victim’s statement before returning to headquarters.
At around 8:00 a.m., that same morning, Darleen Currington (victim’s mother), walked down to the green house on Annunciation Street where she confronted Ms. Wells, who lived there, concerning the identity of the defendant. Around 2:30-3:00 p.m., the she made a 911 call with information as to the defendant’s identity. While she and the victim were waiting for the NOPD to arrive, they notice the defendant walking down the street with his girlfriend and pushing a baby stroller. He was wearing black pants and a black “Dickie” shirt. The victim once again called 911.
14 Officer Waterman was the first to arrive to the scene in the 3900 block of Annunciation Street. As he approached the defendant and his girlfriend, the defendant took off running toward the 3700 block of Annunciation. Officer Waterman chased the defendant in a foot pursuit, but ultimately lost sight of him. He immediately set up a perimeter in the area encompassing the defendant within a 6-7 *1262 block radius. Soon thereafter, the K-9 unit arrived and the manhunt continued until the K-9 alerted to a house at 617 Peniston Street. Officer Trey Pichón climbed the roof of the house and discovered the defendant. The only thing discovered, pursuant to a pat down search of the defendant, was a 9 millimeter unspent cartridge. The defendant was no longer wearing the black “Dickie” shirt, that he had discarded earlier and was later located at the scene. The defendant was arrested.
Incident to this arrest, a search warrant was issued for 3817 Annunciation Street, the defendant’s presumed residence; however, no gun or any of the victim’s possessions were discovered.
During the course of trial, six witnesses testified on behalf of the State: the investigating officers, Officer John Waterman, Officer Trey Pichón, and Detective Kristen Krzemienieeki, the victim’s mother, the victim, and the Orleans Parish Prison telephone supervisor, Deputy Donald Hancock.
The defendant called three witnesses to testify for the defense, including the responding K-9 officer, Sergeant Harry Sto-vall, the defendant’s uncle, Sidney Simms, as well as Detective Krzemienieeki.
Prior to testimony, the parties stipulated that the defendant was previously convicted of discharging a firearm where it was foreseeable that death or greater bodily harm would be committed in the 24th Judicial District Court for Jefferson | ¡^Parish, Case No. 2006-3442, which was the predicate offense for the felony possession of a firearm charge. The parties further stipulated that the 911 operator, if called to testify, would testify as to the authenticity and the contents of the 911 tapes as well as the incident recalls. The 911 tapes were played for the jury.[3]
Officer John Waterman testified that on January 2, 2012, he had the occasion to investigate an armed robbery that took place at 524 Austerlitz Street. He was assigned to second watch in the Sixth police district on patrol when he received a call from dispatch at around 3:44 p.m. to investigate a suspicious person. He stated that the dispatcher was able to tell him the location of the suspect because the dispatcher was on the line with the alleged victim of the armed robbery that had occurred earlier that morning at about 5:20 a.m. Officer Waterman was informed by dispatch that the victim had observed the subject, later identified as the defendant, walking in the 3900 block of Annunciation Street towards downtown accompanying a black female and was pushing a baby stroller. The defendant was also described as wearing a black “Dickie” shirt and black jeans.
Officer Waterman subsequently relocated and observed the defendant at the intersection of Peniston Street and Annunciation Street, two blocks east from where the defendant was initially observed. He testified that the defendant matched the description of the subject given by dispatch and was wearing a black button-up style “Dickie” shirt and black jeans. As a result, he elected to stop the defendant to investigate further. He stated that when he attempted to stop the defendant for questioning, the defendant “immediately took off running in an |fieastbound direction on Annunciation Street toward *1263 downtown.” He attempted to pursue the defendant but lost sight of him after he jumped a chain link fence on the corner of Annunciation and Amelia Street. He called for backup and set up a containment perimeter. After setting up the perimeter, a K-9 unit was called to assist the police in searching for the defendant. He testified that approximately three hours later the defendant was found on the roof of an abandoned home, located at 617 Pe-niston Street. Following the defendant’s arrest, he conducted a search of defendant’s person and found a nine millimeter round in the right pocket of the defendant’s pants. He stated that at the time of the arrest, the defendant was no longer wearing the black shirt, but that the shirt was later located on the scene.
On cross-examination, Officer Waterman testified that the black “Dickie” shirt found on the scene does not have a hoodie and that he never found a hoodie. He estimated that at least ten officers and one dog were searching for the defendant, and they never found a hoodie, a gun, or a purse. He stated that he never spoke with the victim, and that the lead detective in the case was Detective Krzemieniecki.
Officer Troy Pichón testified that he assisted in the investigation of the armed robbery on January 2, 2012. Specifically, he helped the officers in setting up the containment perimeter and apprehending the defendant. He stated that after the dog alerted the officers to the property at 617 Peniston Street, the officers spent about an hour and half searching the property for the defendant. Eventually, the officers used a ladder to go to the roof of the property. He stated he was the first officer to reach the rooftop and initially did not observe the defendant because of the steep pitch of the roof. However, once he made it to the pitch of the roof, he observed the defendant “sprawled out on the rooftop on his stomach with his arms |7and legs spread wide open trying to conceal himself behind some bushes or leaves” from a neighboring tree. When the defendant was ordered to show his hands, Officer Pichón stated that the defendant began to plead with the officers and stated that he ran because he was scared. He could not recall what the defendant was wearing, but testified that the defendant was not wearing the black “Dickie” shirt at the time he was apprehended.
On cross-examination, Officer Pichón testified that around fifteen officers were involved in searching for the defendant. He admitted that he and other officers did not find a weapon, purse, shoes, credit card, or cell phone in the perimeter.
Detective Kristen Krzemieniecki testified that she was the lead investigator in the armed robbery that occurred on January 2, 2012, at 524 Austerlitz Street. She stated that the Officer Carlos Amador initially responded to the robbery that morning. Officer Carlos Amador, is no longer with the NOPD. Detective Krzemieniecki stated that she was called out to the scene at approximately 4:00 p.m. because the victim had learned additional information about the suspect. She stated that before the defendant was apprehended, she had spoken to the victim and her mother who gave a description of the perpetrator and that earlier that day the victim had seen the defendant walking down Annunciation Street. She confirmed that the person apprehended on the roof on 617 Peniston Street was Sedrick Simms.
Detective Krzemieniecki stated that during the course of her investigation she learned that at the time of the robbery the defendant was residing with his girlfriend, *1264 Mariah Taylor, at 3817 Annunciation Street. After the defendant was arrested and taken into custody, she requested that the NOPD intelligence unit pull 18the tapes from phone calls the defendant made from Central Lockup. She stated that the tapes indicated that the handgun could be located at the defendant’s girlfriend residence, and she obtained search warrant for the property on January 5, 2012. When the warrant was executed, Ms. Taylor was uncooperative and did not provide an explanation for the jail tapes. She testified that the officers were unable to locate a firearm on the premises.
On cross-examination, Detective Krzem-ieniecki acknowledged that she did not have firsthand knowledge of the facts surrounding the armed robbery. She also admitted that she never found a handgun, a purse, a black hoodie, cellphone, or credit cards during the search of Ms. Taylor’s home. She stated that the victim’s purse was found on January 9, 2012, in the 2800 block of Chippewa Street, ten to fifteen blocks away from where the armed robbery occurred on Austerlitz Street and that no fingerprint testing was conducted on the purse. At some point in the course of her investigation, she learned that the defendant’s mother lives in Baton Rouge, but that the defendant had given 3817 Annunciation Street as his address during the arrest.
Detective Krzemieniecki stated that the during the investigation the victim informed her that after the robbery the perpetrator fled the location, took a left on Annunciation Street, which intersects Austerlitz, and ran alongside of a green house located at 3957 Annunciation Street.
Detective Krzemieniecki subsequently spoke to the resident of the green house, Denise Wells, about whether she knew anyone who matched the physical description provided by the victim. Ms. Well gave the name of the person who physically fit that description, Sedrick Simms.
|flThe victim testified that she was robbed at gunpoint on January 2, 2012. She state that earlier, at approximately midnight, she and three friends went to in the French Quarter to walk up and down Bourbon Street, and that she had one hand grenade when she was in French Quarter. After a few hours, she and her friends got food at Brother’s Food Store, located off of Canal Street, which they ate in the car as they drove home. The victim was the last of the party to be driven home by the designated driver, Clebo Laboe.
Upon arriving to her residence on Austerlitz Street, the victim knocked on the window for her boyfriend to let her in. While she was waiting for her boyfriend to unlock the door, she stated that the defendant walked up next to her and said “give me your money.” The victim told the defendant that she did not have any money, but the defendant stated that he saw her “coming and going every day.” She stated that when she looked at his face she thought he may be from the neighborhood and asked “are you really going to rob me[?]” She testified that she was able to see the defendant because of the street light and that he was wearing a black hoodie and black jeans, but that the hoodie was not covering his head. He subsequently pulled out a gun and stuck it in her ribs; she handed him her purse which contained her phone, her shoes, and the food she purchased earlier.
She stated that the defendant took off running towards the green house on Annunciation Street. After her boyfriend opened the door, she called her mother and then the police. The initial 911 call *1265 was played again for the jury. In the 911 phone call, the victim informed the 911 operator that the defendant went “straight through the cut” and that she saw the house that the defendant went “into.” However, the victim clarified at trial that she did not actually see him go into the green house, but that he went in the direction of the green house. The victim | ^described the defendant’s appearance as well the events of the incident to the police officers who arrived on scene.[4]
The victim stated that her mother arrived at her house at 7:00 or 8:00 a.m. and that they went to a news station about the robbery where they were given advice about how to proceed. She stated that she and her mother subsequently learned that the defendant’s name was Sedrick Simms from a person residing at the green house. However, in cross-examination, it was revealed through a recording of a private investigator[5] that the victim did not know the defendant’s name until after his arrest. The victim testified that she and her mother later observed the defendant and a young woman walking up Annunciation Street with a baby stroller. The victim rode her daughter’s electric scooter to get a better look and as she approached, the defendant nodded his head at her. The victim testified that at that point she knew the defendant was the person who robbed her and began to panic. After she returned home on the scooter, she called the police again. The victim informed the 911 operator that man that had robbed her was on the scene, and she described what he was wearing. The victim stated that the defendant was wearing a black “Dick-ie” shirt when she recognized him on the street and was no longer wearing the black hoodie he wore during the robbery. The victim identified the defendant as the man who robbed, the man that she saw walking in the neighborhood, and the man that the police apprehended later that day.
InOu cross-examination, the victim testified that the defendant approached her from the side of her home. She stated that he was not there when was she was walking from the car to her residence, but arrived as she was waiting for her boyfriend to unlock the door. She described the defendant as an African-American, about five foot six inches tall, weighing approximately 150 pounds, having a crooked hair line, thick eyebrows and deep set eyes. She did not observe that the defendant had facial hair. However, the booking photograph of the defendant showed that he had a moustache and some hair on the chin. When the defendant was presented with the photograph, she acknowledged the moustache and small goatee, but explained that the defendant did “not have any hair on his jaws.” She testified that she knew that the gun was a nine millimeter because she and her boyfriend had previously gone looking to pur *1266 chase a gun. She stated that when her purse was returned to her, her wallet was inside, but that it was missing the debit cards.
The victim’s mother’s testimony virtually mirrors and corroborates the victim’s rendition of the events that transpired relative to the incident.
Deputy Donald Hancock testified that he is the Orleans Parish Prison telephone supervisor and oversees inmate telephone systems. He stated that inmate calls are recorded and archived to a server. He stated that anytime an inmate makes a phone call, he must give the folder number that he was issued in booking. He identified the call detail report assigned to the defendant’s folder number, which showed that the defendant made two phone calls on January 3, 2012. The recordings of these calls were played for the jury. Each party submitted a separate transcript of what they believed was stated on the calls. Deputy 112Hancock testified that the arrest registry lists the defendant’s weight as 150 pounds and his height as 5'8.
After the State offered and introduced several exhibits into evidence,[6] the defense called Sergeant Harry Stoval to testify. He testified that he is a member of the K-9 unit that searched for the defendant on January 2, 2012. He stated that he took one German Shepard to the scene to assist in the search for the defendant. He stated that they used a black “Dickie” shirt and sweater found on the scene to track the defendant to the roof of 617 Peniston Street. On cross-examination he stated that the defendant had fled the police before the dog had arrived on the scene.
Sydney Simms, the defendant’s uncle testified that he lives at 3827 Annunciation Street, three blocks from where the incident took place. He stated the defendant was living with his mother in Baton Rouge in January of 2012. He stated that he had seen the defendant on January 1, 2012, the day before the robbery, because the defendant was visiting his girlfriend and his family. He stated that when the defendant comes to visit, he usually stays at his grandmother’s or his girlfriend’s house. He stated that in the last two years there had been five or six homicides near the green house on 3957 Annunciation Street. He stated a few young black males reside at the green house.
On cross-examination, Mr. Simms stated that the defendant did not go by the nickname “Monster.” He stated that the defendant has not hung out at the green house since shootings had occurred two years earlier. He said that the defendant | iswas staying with his girlfriend, two blocks from where the robbery occurred, the night of January 1, 2012, but could not say where the defendant was at the time of the robbery. He testified that he has never seen the defendant in the black “Dickie” shirt presented by the State.
The last witness the defendant called to testify for the defense was Detective *1267 Krzemieniecki who stated that the initial police report which was authored the first responding officer, provided that the defendant’s estimated weight was 110 pounds. She testified on cross-examination that during the course of the investigation she learned from the defendant’s girlfriend that the defendant went by the nickname “Monster.”[7]

ERRORS PATENT

A review of the record reveals two errors patent.
The first error concerns the sentence imposed by the trial court’s sentence for the defendant’s conviction of felon in possession of a firearm. La. R.S. 14:95.1(B) provides that “[w]hoever is found guilty of violating the provisions of [possession of a firearm by a convicted felon] shall be imprisoned at hard labor for not less than ten nor more than twenty years without the benefit of probation, parole, or suspension of sentence and be fined not less than one thousand dollars nor more than five thousand dollars.”
In the present case, the trial court sentenced the defendant to twenty years without benefit of probation, parole, or suspension of sentence, but failed to 114impose the mandatory fine required by La. R.S. 14:95.1(B). See, State v. Martin, 2010-1356, p. 3 (La.App. 4 Cir. 8/24/11), 72 So.3d 928, 932 (the failure to impose a mandatory fine require remand for imposition of that fine); see also, State v. Williams, 2003-0302, pp. 3-4 (La.App. 4 Cir. 10/6/03), 859 So.2d 751, 753 following State v. Legett, 2002-0153, pp. 3-4 (La.App. 4 Cir. 5/22/02), 819 So.2d 1104, 1106 and State v. Hall, 2002-1098, pp. 5-6 (La.App. 4 Cir. 3/19/03), 843 So.2d 488, 494. Therefore, we remand the matter for the imposition of an appropriate fine pursuant to La. R.S. 14:95.1(B).
The second error concerns the sentence imposed by the trial court against the defendant as a second offender on the armed robbery with a firearm conviction.
The term of imprisonment for the commission of an armed robbery is hard labor for not less than ten years and not more than ninety-nine years, without benefit of parole, probation, or suspension of sentence. La. R.S. 14:64(B). When the dangerous weapon used in the commission of the crime of armed robbery is a firearm, an additional penalty of five years shall be imposed, which five years is to run consecutively. La. R.S. 14:64.3(A). The Louisiana Supreme Court in State v. King, 2006-1903, p. 8 (La.10/16/07), 969 So.2d 1228, 1232, held that the additional five-year sentence provided by La. R.S. 14:64.3 can be imposed when the defendant is sentenced pursuant to the habitual offender law.
Here, after adjudicating the defendant a second felony offender on the charge of armed robbery with a firearm, the trial court sentenced the defendant to seventy years, without benefit of probation, parole, or suspension of sentence. Although the seventy year sentence the defendant received is within the sentencing grange provided by La. R.S. 15:529.1(A)(l)(a),[8] the trial court did not specify whether that *1268 sentence included the enhanced term of imprisonment under La. R.S. 14:64.3(A).
This Court has previously held that a sentence is indeterminate and illegally lenient when the trial court fails impose a consecutive five-year enhancement sentence as mandated by La. R.S. 14:64.3(A). This Court in State v. Burton, 2009-0826, p. 3 (La.App. 4 Cir. 7/14/10), 43 So.3d 1073, 1076, stated “[i]n cases where the minimum sentence was not imposed ... that the sentences are indeterminate, requiring that the sentences be vacated and the matter remanded for resentencing according to law for clarification of whether the defendant’s sentence includes any additional punishment under La. R.S. 14:64.3.” Id. (citing State v. Weaver, 38,322 (La.App. 2 Cir. 5/12/14), 873 So.2d 909; State v. McGinnis, 2007-1419 (La.App. 3 Cir. 4/30/08), 981 So.2d 881; State v. Price, 04-812 (La.App. 5 Cir. 3/1/05, 909 So.2d 612)). As a result, the Burton Court vacated the defendant’s sentence and remanded the matter for resentencing.
In State v. Adams, 2010-1140, p. 11 (La.App. 4 Cir. 6/1/11), 68 So.3d 1165, 1172-1173, this Court also remanded a case for a new sentencing hearing when it was unclear if the trial court failed to impose the “additional five years in prison pursuant to La. R.S. 14:64.3” or merely “failed to specify that it had done so.”
Thus, because the trial court failed to articulate whether the sentence it imposed included the mandatory and additional five years for armed robbery, a firearm, under La. R.S. 14:64.3(A), we vacate the seventy year sentence and |1firemand the case for clarification and/or resentencing in accordance with La. R.S. 14:64.3 and La. R.S. 15:529.1.
DISCUSSION
ASSIGNMENT OF ERROR NUMBER 1
As his sole assignment of error, the defendant contends that the trial court erred in denying the defendant’s motion for mistrial due to improper statements made during the State’s rebuttal argument.[9]
Concerning this issue, the State claims that the defendant “waived his right to assign as error denial of the motion for mistrial” because he failed to contemporaneously object to the trial court’s failure to rule on his motion for mistrial.
The State is correct in that the trial court did not actually render a ruling on the defendant’s request for mistrial. The record provides that after the defendant objected to the comments made by the State in rebuttal, the trial court sustained that objection and advised the jury that the State, not the defendant, bore the burden of proof. The State indicated that that was not its intention, and the defendant moved for mistrial. The State then asked to finish its sentence and continued *1269 with its rebuttal. The trial court therefore did not specifically deny the defendant’s motion for mistrial.
Under La.C.Cr.P. art. 841(A) “[a]n irregularity or error cannot be availed of after verdict unless it was objected to at the time of the occurrence.” However, this l17Court has held that when the trial court sustains an objection to the prosecutor’s remarks and defense counsel fails to request an admonition or a mistrial, the defendant cannot claim the comment was prejudicial. State v. Galindo, 2006-1090, p. 14 (La.App. 4 Cir. 10/8/07), 968 So.2d 1102, 1112-111; State v. Dank, 99-0390, pp. 10-11 (La.App. 4 Cir. 5/24/00), 764 So.2d 148, 158; State v. Biagas, 99-2652, p. 11 (La.App. 4 Cir. 2/16/00), 754 So.2d 1111,1117-1118, citing State v. Baylis, 388 So.2d 713, 720-721 (La.1980). Here, although the defendant did not object to the trial court’s failure to rule on his motion, the defendant did move for mistrial after the trial court sustained his objection and thus he preserved his right to seek review of the State’s remarks in rebuttal.
It is important to note, however, when the defendant objected to the State’s allegedly improper remarks in rebuttal and moved for mistrial, he did not state grounds therefor. The contemporaneous objection rule, La.C.Cr.P. art. 841(A), not only provides that the party alleging error object at the time of the occurrence of the alleged error, but also requires that the party state the grounds for the objection. State v. Marlowe, 2010-1116, p. 35 (La.App. 4 Cir. 12/22/11), 81 So.3d 944, 965-966 {citing State v. Richards, 99-0067, p. 4 (La.9/17/99)), 750 So.2d 940, 942 (“An objection stating no basis presents nothing for this court to review”); State ex rel. D.R., 2010-0405, p. 3 (La.App. 4 Cir. 10/13/10), 50 So.3d 927, 929 (“It is well settled that [a] defendant must state the basis for his objection when he makes it so that the trial judge has an opportunity to rule on it and prevent or cure an error.”). Moreover, a defendant is limited on appeal to those grounds for the objections which he articulates at trial. Id. (citing State v. Brooks, 98-0693, p. 9 (La.App. 4 Cir. 7/21/99), 758 So.2d 814, 819; State v. Buffington, 97-2423, p. 9 (La.App. 4 Cir. 2/17/99)), 731 So.2d 340, 346. Because the defendant failed to articulate the grounds for his objection to the State’s rebuttal argument or the basis for his motion for mistrial, the defendant did not sufficiently preserve the issue for appellate review.
The general rules governing closing and rebuttal argument are set forth in La.C.Cr.P. art. 774. The scope of closing argument “shall be confined to the evidence admitted, the lack of evidence, conclusions of fact that the State or the defendant may draw therefrom, and the law applicable to the case.” La.C.Cr.P. art. 774. Closing argument shall not appeal to prejudice. Id. The state’s rebuttal shall be confined to answering the argument of the defendant. Id. Prosecutors may not resort to personal experience or turn argument into a plebiscite on crime. State v. Clark, 2001-2087, p. 15 (La.App. 4 Cir. 9/25/02), 828 So.2d 1173, 1183 (citing State v. Williams, 96-1023, p. 15 (La.1/21/98), 708 So.2d 703, 716). However, prosecutors have wide latitude in choosing closing argument tactics. Id. (citing State v. Casey, 99-0023, p. 17 (La.1/26/00), 775 So.2d 1022, 1036 and State v. Martin, 539 So.2d 1235, 1240 (La.1989)) (closing arguments that referred to “smoke screen” tactics and defense as “commie pinkos” were deemed inarticulate but not improper). Further, the trial judge has broad discretion in controlling the scope of closing arguments. *1270 Id. Even if the prosecutor exceeds the bounds of proper argument, a reviewing court will not reverse a conviction unless “thoroughly convinced” that the argument influenced the jury and contributed to the verdict. Id. (citing State v. Ricard, 98-2278, p. 4 (La.App. 4 Cir. 1/19/00)), 751 So.2d 393, 397. Even where the prosecutor’s statements are improper, credit should be accorded to the good sense and fairmindedness of the jurors who have 119heard the evidence. Id. (citing Williams, 96-1023, p. 15, 708 So.2d at 716, and Ricard, 98-2278, p. 4, 751 So.2d at 397).
Upon motion of a defendant a mistrial shall be ordered when prejudicial conduct in or outside the courtroom makes it “impossible for the defendant to obtain a fair trial, or when authorized by Article 770 or 771.” See, La.C.Cr.P. art. 775. La. C.Cr.P. art. 770(3) provides for a mandatory mistrial when prejudicial comment made within hearing of the jury by the judge, district attorney, or a court official “refers directly or indirectly to ... the failure of the defendant to testify in his own defense.” La.C.Cr.P. art. 771 provides for discretionary mistrials and admonitions when a remark or comment made within the hearing of the jury during trial or in argument is of such a nature that it might create prejudice against the defendant in the mind of jury. The article provides:
In the following eases, upon the request of the defendant or the state, the court shall promptly admonish the jury to disregard a remark or comment made during the trial, or in argument within the hearing of the jury, when the remark is irrelevant or immaterial and of such a nature that it might create prejudice against the defendant, or the state, in the mind of the jury:
(1) When the remark or comment is made by the judge, the district attorney, or a court official, and the remark is not within the scope of Article 770; or
(2) When the remark or comment is made by a witness or person other than the judge, district attorney, or a court official, regardless of whether the remark or comment is within the scope of Article 770.
In such cases, on motion of the defendant, the court may grant a mistrial if it is satisfied that an admonition is not sufficient to assure the defendant a fair trial.
Mistrial is a drastic remedy which should only be declared upon a clear showing of prejudice by the defendant. State v. Leonard, 2005-1382, p. 11 (La.6/16/06), 932 So.2d 660, 667. The mere possibility of prejudice is insufficient 12nto warrant a mistrial. Id. “Mistrial is an extreme remedy and, except for instances in which the mandatory mistrial provisions of La. C.Cr.P. art. 770 are applicable, should only be used when substantial prejudice to the defendant is shown.” State v. Castleberry, 98-1388, p. 22 (La.4/13/99), 758 So.2d 749, 768.
The defendant argues on appeal that the trial court erred in denying his motion for mistrial because the State made direct and indirect references to the defendant’s failure to testify during closing arguments. The comment to which the defendant refers occurred during the State’s rebuttal argument, wherein the State argued:
I’m telling you [sjhe’s mistaken. I’m telling you he’s innocent. You know who got on the stand and said that, who said that he’s innocent, that[] she’s mistaken? Nobody. The only person that *1271 came in her and told you that is this defense attorney. And let’s be perfectly clear on something, ladies and gentlemen. What I say is not evidence. What Ms. Parker [the other assistant district attorney] says is not evidence, and what they [the defense] have to say is not evidence. You have zero evidence of this man’s innocence. Now, he wants to stand up here and talk about what he’s saying and what he wants to talk about. And you know what’s real funny? From the beginning of this trial throughout this entire trial he hasn’t spoken once about why in the world—
The aforementioned statement does not appear to directly mention the defendant’s failure to take the stand. It is apparent that the “he” in which the State references in the last sentence is defense counsel, not the defendant. Thus, the State did not directly refer to the defendant’s failure to testify in his own defense. See, State v. Valentine, 375 So.2d 1378, 1379 (La.1979) (prosecutor’s statement that “[i]f [defendant] wants to testify to it, he has a right to get up and do it” was a direct and a reversibly improper comment on defendant’s constitutional right not to testify); State v. Ballay, 01-493, pp. 10-11 (La.App. 5 Cir. 10/17/01), 800 So.2d 953, 958 (the prosecutor’s comment that “[defendant] did not take the stand” was a direct reference to the defendant’s failure to testify at trial which mandated a mistrial).
The next issue is whether the State’s remarks constitute an indirect reference to the defendant’s failure to testify. In State v. Mitchell, 2000-1399, (La.2/21/01), 779 So.2d 698, the Louisiana Supreme Court held when the prosecutor makes an indirect reference to the defendant’s failure to take the stand and testify, a reviewing court must inquire into the remark’s intended effect on the jury in order to distinguish indirect references to the defendant’s failure to testify (which are impermissible) from general statements that the prosecution’s case is unrebutted (which are permissible). Id. at pp. 4-5, 779 So.2d at 701 (citing State v. Johnson, 541 So.2d 818, 822 (La.1989); State v. Fullilove, 389 So.2d 1282, 1284 (La.1980); State v. Jackson, 454 So.2d 116, 118 (La.1984)). “In order to support the granting of a mistrial, the inference must be plain that the remark was intended to focus the jury’s attention on the defendant’s not testifying.” Id. at p. 5, 779 So.2d at 701 (citing State v. Smith, 327 So.2d 355, 362 (La.1975) (on rehearing); State v. Reed, 284 So.2d 574, 576 (La.1973); State v. Howard, 262 La. 270, 263 So.2d 32 (1972)). The context of indirect reference is therefore crucial to whether the statement is permissible.
The Louisiana Supreme Court further explained that an indirect reference to the failure to testify that mandates the granting of a mistrial occurs where the focus is on the accused’s failure to testify, such as when he is the only witness who can rebut the state’s evidence. However, if another witness who could have testified on the accused’s behalf exists, the indirect reference does not focus on the accused’s failure to testify, and a mistrial is not warranted. Mitchell, 2000-1399, p. 5, 779 So.2d at 701-702 (citing State v. Perkins, 374 So.2d 1234, 1237 (La.1979); Fullilove, 389 So.2d at 1284; State v. Harvill, 403 So.2d 706, 711 (La.1981); State v. Jackson, 454 So.2d 116, 118 (La.1984); State v. Smith, 433 So.2d 688, 697 (La.1983); State v. Latin, 412 So.2d 1357, 1363 (La.1982)). The Louisiana Supreme Court also noted that [statements in argument to the effect that there is no refuting evidence does not constitute an impermissible reference to the defendant’s failure to testify. Mitch *1272 ell, 2000-1399, p. 5, 779 So.2d at 702 (citing State v. Reed, 284 So.2d 574, 576 (La.1973) and State v. Cryer, 262 La. 575, 263 So.2d 895 (1972)).
Here, the State’s comments in rebuttal was not intended to focus the jury’s attention on the defendant’s failure to testify because he is not the only witness that could rebut the State’s evidence against him. In fact, the defendant called three witnesses to testify on his behalf. The defendant called Sergeant Stoval to attempt to show that the reason the defendant ran from the police was because he was scared of the dog. The testimony of the defendant’s uncle, Sydney Simms, was offered in the attempt to establish that the defendant was at his girlfriend’s house at the time of the robbery, as well as to suggest that one of the young men associated with the green home on Annunciation was more likely the perpetrator of the crime. The defendant’s final witness, Detective Krzemienieeki, was called to the stand to state that the first police report authored by the officer who responded to the first 911 call listed the defendant’s weight as 110 pounds, to create doubt regarding the victim’s credibility and as to whether the defendant was accurately identified as the perpetrator. Additionally, the record provides that the defendant’s girlfriend, Ms. Taylor, who was with the defendant the day of the incident and whom the defendant called from jail, was subpoenaed and could have testified on behalf of j^the defendant in attempt to refute the State’s evidence. Because the defendant was not the only defense witness who could be called to rebut the testimony and evidence offered by the State, the State’s comment in rebuttal were not an indirect reference to the defendant’s failure to testify such that it would entitled him to a mistrial.
Furthermore, the State’s rebuttal seems to be responding to the statements made by defense counsel in closing argument. In his closing argument, the defense counsel claimed that the case was about identification, and because the State had no physical evidence that proved the defendant was guilty, it had to establish identification beyond a reasonable doubt. The defendant discussed the alleged inconsistencies in the victim’s testimony concerning the defendant’s appearance. The transcript provides, in relevant part:
I mean we’re talking about facial hair. It’s a serious misrepresentation — or not a misrepresentation. I think she [the victim] believes what she’s saying. I’ll be honest, I think she’s convinced that what she’s saying is the truth.
But I’m telling you she’s mistaken. For all the right objective reasons.
When you get in there everything falls apart if you don’t believe the identification, if you don’t believe that she actually knew what she saw and properly identified him.
* * *
Because when all you got is the ID and all you’ve got is an eyewitness, and that eyewitness account has to beyond a reasonable doubt.
So I submit to you that you’ve seen the trial of a free or an innocent man.
Reading the State’s rebuttal in conjunction with the defense’s closing indicates that that State was referring to the absence of evidence to support defense counsel’s claims and the fact that statements made by defense counsel are not evidence. The | ^State’s comments therefore do not constitute an impermissible indirect reference to the defendant’s failure to testify.
The comments made after the defendant moved for mistrial also indicate that it was *1273 not the intention of the prosecution to improperly create prejudice in the minds of the jury. As noted earlier, the record provides that following the defendant’s request for mistrial, the prosecutor asked the trial court to allow him to finish his sentence because he did not believe what he was going to say would constitute a “violation.” The prosecutor then argued:
What I was going to say, ladies and gentlemen, is throughout the entire argument, though the entire opening, from every witness, you didn’t hear one question about why this man [Defendant] decided to run from the police. Why it was if he’s innocent and just walking down Annunciation ... [u]pon seeing Officer Waterman, why is that he turn tail [sic], runs, hops a fence, scales a two story house, sprawls out on that house where he can’t be found for three hours.
Does that person sound like an innocent person to you? Does that sound like someone who didn’t do anything? To Mr. Giselson [defense counsel] apparently it does.
Thus, viewing the State’s comments in context, the prosecution did not intend to call attention to the defendant’s failure to testify. The State’s remarks in rebuttal do not fall within the ambit of La.C.Cr.P. 770, which would mandate a mistrial. Therefore, the trial did not err in denying the defendant’s motion for mistrial.
Even assuming that the State’s rebuttal was improper, prejudicial, or exceeded the bounds of proper argument, as noted earlier, a reviewing court will not reverse a conviction unless ‘thoroughly convinced’ that the argument influenced the jury and contributed to the verdict. State v. Hoffman, 98-3118, p. 45 (La.4/11/00), 768 So.2d 542, 585; State v. Martin, 93-0285, p. 18 (La.10/17/94), 645 So.2d 190, 200; State v. Jarman, 445 So.2d 1184, 1188 (La.1984); State v. Dupre, 408 So.2d 1229, 1234 (La.1982). In making this determination, the reviewing court should accord credit to good sense and fair mindedness of jurors who have heard the evidence. State v. Jarman, 445 So.2d 1184, 1188 (La.1984); Williams, 96-1023, p. 15, 708 So.2d at 716; Ricard, 98-2278, p. 4, 751 So.2d at 397.
The defendant contends that State’s remarks concerning the failure of the defendant to present evidence in rebuttal undoubtedly contributed to the jury’s verdict because the victim of the robbery gave contradictory testimony regarding the perpetrator’s appearance. Defendant relies on the fact that on cross-examination, the victim testified that she did not observe any facial hair on the perpetrator but when presented with a booking photo of the defendant, acknowledged that the defendant had a moustache and “some hair on his chin.”
However, a review of her entire testimony suggests that the victim thought that when defense counsel asked her about facial hair, he was referring to a beard or hair along the defendant’s jaw. In fact, right after conceding that the defendant had a moustache and a little goatee, the victim stated, Right, yes ... But he doesn’t ... have any hair on his jaws or anything like that. Also, the victim later testified that when she described the perpetrator to the resident of the green home she indicated that he had a little hair on his chin. When confronted with her earlier testimony, wherein she was “certain that [the perpetrator] didn’t have any facial hair,” the victim responded, “I thought you [defense counsel] was [sic] talking about on the side. I didn’t know *1274 you was [sic] talking about his moustache.” The | ¡¡¿jury could reasonably presume based on these statements that the victim was confused and assumed facial hair meant a beard.
The possible discrepancy in the victim’s testimony regarding facial hair, however, is not irreconcilable or fatal in light of the other evidence adduced at trial. The victim specifically testified that she would not forget the robber’s face due to his distinctive facial features. She consistently testified that the perpetrator had a “crooked” hairline, where “one side was hiked up and the other one was lower,” thick eyebrows, and deep set eyes. She further testified that she thought she recognized the perpetrator from the neighborhood and saw him in the street a week or so before the robbery. In fact, she stated that the perpetrator indicated that he knew she had money because he saw her coming and going from her home daily. The arrest record appears to corroborate that the defendant was staying in the area as he listed 3817 Annunciation, his girlfriend’s house, as his address. She testified that was able to get a good look at the perpetrator because he was standing close to her face when he spoke to her. She was able to observe that that the handgun the defendant pressed against her side was a nine millimeter. She later informed the police officers that the perpetrator was African-American, wore black jeans, was about 5'6 tall and weighed approximately 150 pounds. The victim’s estimate of height and weight is compatible with the arrest register, identified by Deputy Hancock, which listed the defendant as 5'8 and 150 lbs. Furthermore, hours after the robbery both the victim and her mother testified that they observed the defendant walking on Annunciation Street, near the home the perpetrator had fled. The victim was able to confirm that the defendant was the perpetrator when she got closer and called the police again to inform them that the defendant was on |27scene and described what the defendant as wearing a black “Dickie” shirt and black jeans.
Officer Waterman, the policeman who responded to the call, observed a subject matching the description provided a few blocks from where the defendant was observed by the victim. The defendant immediately fled when he saw the officer. Officer Pichón testified that three hours later he found the defendant hiding on the roof at house nearby on Peniston Street. Both Officer Waterman and Officer Pichón stated that the defendant was no longer wearing the black “Dickie” shirt, but that it was later found on the scene. Officer Waterman arrested the defendant and testified that he found a nine millimeter bullet in the defendant pants. The parties also stipulated that the defendant has been previously convicted of discharging a firearm where it was foreseeable that death or greater bodily harm might occur.
The record provides that after State made the allegedly prejudicial remarks, the trial court sustained the defendant’s objection and instructed the jury: The defense has no burden of proof. They don’t have to put anybody up here to say he’s innocent. They don’t have to call any witnesses. And the suggestion that they have some sort of duty is simply wrong. Thus, the trial court corrected any mistaken impression the jury might have been given by the State’s remarks.
Taking into account the testimony of all the witnesses and the evidence introduced at trial, and giving credit to the good sense and fair-mindedness of the jurors who heard the arguments and evidence, the State’s comments in rebuttal did not clear *1275 ly influence the jury nor did they contributed to the verdict as there sufficient evidence for the jury to conclude that the defendant was guilty armed robbery and possession of a firearm. This assignment of error has no merit.
^CONCLUSION
For the above and forgoing, we find that the trial court did not err in denying the defendant’s motion for a mistrial. Accordingly, we affirm the defendant’s convictions for armed robbery and felony possession of a firearm. We remand the matter to the trial court for resentencing pursuant to La. R.S. 14:95.1(B). As to the defendant’s conviction of felon in possession of a firearm, we vacate the sentence imposed upon the defendant as a second offender on the armed robbery with a firearm conviction, and remand for resentencing to impose a sentence to include the enhanced term of imprisonment under La. R.S. 14:64.3(A).
CONVICTIONS AFFIRMED; VACATED IN PART AND REMANDED IN PART.

. The multiple offender bill was based on the jury’s August 21, 2013 verdict (armed robbery with a firearm and possession of a firearm by a convicted felon), as well as the defendant’s earlier guilty plea in 2008 for possession of cocaine with the intent to distribute in the 24th Judicial District Court. However, the record provides that the State later amended the bill to remove the defendant’s felon in possession of a firearm conviction. Thus, the multiple offender bill of information, as amended, charged the defendant as a double felony offender based on the 2013 armed robbery with a firearm conviction and the 2008 guilty plea for possession with intent to distribute.

. The motion to reconsider was based on the excessiveness of the sentence and the unconstitutionality of La. R.S. 14:95.1.

. The 911 tapes consisted of six separate phone called. The first one occurred at 5:27 a.m., the second occurred at 2:50 p.m., and the remaining calls occurred around 3:42 p.m.

. There were two separate groups of officers that came to investigate the victim’s call after the robbery. The victim stated that she told the officers that the defendant was wearing a black shirt and jeans, had thick eyebrows, had recognized him from the neighborhood, and that he ran towards the green house. The officers looked around and stated they did not find any footprints. The victim was unsatisfied with the initial responders and called for more police to come to the scene. The victim described the incident again to the second group of officers.

. The defense had hired an investigator to obtain a recorded statement from the victim a week before trial. The recording, which was played to the jury, indicated that the victim did not learn that Sedrick Simms was the defendant's name until after he was arrested by the police.

. The State submitted the following exhibits into evidence: the certified package of the defendant’s prior predicate conviction, two incident recalls, the three 911 recordings, a map of the crime area, the black "Dickie” shirt, the nine millimeter bullet found on the defendant, the search warrant (for record purposes only), Officer Waterman’s supplemental report, the face sheet of the police report, a photograph of the green house, a photograph of victim's house, The defendant's booking photograph, a blown-up photograph initially offered by the defense, the arrest register (for record purposes only), the call detail (for records purposes only), the transcript of the defendant's telephone calls from prison, and the disc of the recorded phone calls.

. The defendant marked and introduced the following exhibits into evidence: the defendant’s booking photograph, the recording of the victim taken by the private investigator a week before trial, and blown-up photographs.

. La. R.S. 15:529.1(A)(1)(a) provides that if "the second felony is such that upon a first conviction the offender would be punishable by imprisonment for any term less than his natural life, then the sentence to imprison *1268 ment shall be for a determinate term not less than one-half the longest term and not more than twice the longest term prescribed for a first conviction.”

. The defendant had also moved for mistrial prior to closing arguments based on the questions posed by the State to the defendant's uncle, Sydney Simms, concerning the defendant's involvement in shootings/killing in the 3800-3900 blocks of Annunciation. Although the trial court had sustained the defense's objection in that regard, the defendant argued that the State’s reference to his priors prejudiced the jury. The trial court denied the motion for new trial noting that the parties had already stipulated as the defendant’s predicate offense of discharging a firearm. The trial court stated, however, the jury would be instructed to disregard any shootings mention by the State concerning the defendant aside from stipulated offense.