TERRI F; LOVE, Judge.
hDavid D. Merwin (“Defendant Mer-win”) appeals his conviction for one count of aggravated rape in violation of La. RS. 14:42(A)(4), one count of molestation of a juvenile in violation of ’La. R.S. 14:81.2(A)(1), and one count of indecent behavior with a juvenile in violation of La. R.S. 14:81(A)(1) [1]. In his sole assignment of error, Defendant Merwin claims he was denied effective assistance of counsel. He avers that his trial counsel failed to object *761 to testimony regarding his . post-arrest right to remain silent, his previous felony convictions, and the expert opinion testimony relating to the credibility of the victims’ accusations. The issue of ineffective assistance of counsel is typically addressed in an application for post-conviction relief; however, the record provides sufficient evidence to rule on the merits of Defendant Merwin’s claim on appeal. State v. Seiss, 428 So.2d 444, 449 (L&1983). We find a defendant’s post-arrest right to remain silent only applies to the individual arrested and does not apply to the defendant’s wife; 12testimony of Defendant Merwin’s character witness opened the door to rebuttal testimony regarding Defendant Merwin’s prior convictions; and the State’s expert witness indicated that she did not detect any signs that the victims were coached by an adult and she did not render an opinion as to Defendant Merwin’s guilt. Accordingly, Defendant Merwin has not shown that his trial counsel’s performance by failing to object to the testimony elicited at trial was so deficient as to deprive him of a fair trial. Therefore, we affirm Defendant Merwin’s convictions and sentences.

PROCEDURAL AND FACTUAL BACKGROUND

In February 2014, the State charged Defendant Merwin with committing, in August 2013, one count of aggravated rape in violation of La. R.S. 14:42(A)(4), one count of molestation of a juvenile in violation of La. R.S. 14:81.2(A)(1), and one count of indecent behavior with a juvenile[2] in violation of La. R.S. 14:81(A)(1). The following facts were elicited at the March 2015 jury trial.
St. Bernard Sheriff Deputy Chelsie Sou-lagnet’s Testimony
In October 2013, Ms. A.P.[3] visited the St'. Bernard Parish Sheriffs Department to file' a complaint of sexual abuse of her two sons, A.P. and J.G. Ms. A.P. met with St. Bernard Sheriff Deputy Chelsie Sou-lagnet (“Deputy Soulagnet”). She informed the deputy that her ten-year old son A.P. gave her a handwritten note pearlier that day, which she presented to the deputy that read: “David made me suck his peacker [sic].” Deputy Soulagnet then interviewed A.P. The deputy asked A.P. if he wrote the note and why. A.P. explained that a few months earlier in August 2013, he and his younger brother J.G. spent the night at a friend’s house when he was abused by the friend’s father, Defendant Merwin. A.P. told Deputy Sou-lagnet that: “[Defendant Merwin] made me suck his private parts while he made my little brother J.G. watch. ■ He also made us drink alcohol.” Deputy Soulagnet testified that A.P. appeared emotional and tearful when recounting the incident.
Deputy Soulagnet also interviewed J.G. and asked him if he remembered the incident with Defendant Merwin. The deputy testified that J.G. changed the subject and seemed indifferent to Deputy Soulagnet’s questions. ■ After speaking with the victims and their mother, Deputy Soulagnet spoke with Detective Michelle Canepa (“Detective Canepa”) of the juvenile bureau. Detective Canepa advised that Ms. A.P. *762 should have the victims medically evaluated at Children’s Hospital.
Daniel Dooley’s Expert Testimony
The victims and their mother presented to the hospital, wherein the victims were evaluated and interviewed. Daniel Dooley (“Mr. Dooley”), a forensic interviewer at the Child Advocacy Center at Children’s Hospital, interviewed the victims. At trial, Mr. Dooley was accepted as an expert in his field, having done approximately one thousand child interviews. He explained that an interviewer is trained to ask a child open-ended questions to obtain a narrative of the event, rather than posing questions which require a yes or no response. He stated that the child 14is interviewed alone, without the presence of parent(s), siblings or the police, .and the interview is video and audio recorded. At trial, he identified the DVD recordings of his interviews with both victims held in November 2013.[4] ...
J.G.’s Testimony
At trial, J.G. testified and identified Defendant Merwin in court. J.G. testified that he remembered sleeping at Defendant Merwin’s house and that subsequently Mr. Dooley interviewed him about that night. Under cross-examination, J.G. said that Defendant Merwin made him play with himself, telling J.G.: “This is what goes on with the middle .spot.” J.G. also testified that Defendant Merwin gave him about “six or nine” shot cups of “funny tasting” liquid.
In his videotaped interview with Mr. Dooley, J.G. gave an account of the events the night he and his older brother A.P. spent the night at Defendant Merwin’s residence. He stated that Defendant Mer-win made him and his brother watch “nasty videos” that he played, on his phone and on the television. He explained to Mr. Dooley that Defendant Merwin had lotion in a black, skinny bottle, but did not know the name of it because he could not read it. Defendant Merwin explained to the boys that the lotion was-something to put on “the middle spot.” Mr. Dooley asked J.G. what he meant by “the middle spot,” and J.G. described it as “the -pecker.” J.G. said that he put the lotion on underneath his clothes, and Defendant Merwin made them play with themselves.- J.G. explained in |Bthe videotaped interview that he witnessed Defendant Merwin make A.P. suck Defendant Merwin’s penis while Defendant Merwin sat on the couch in the living room. J.G. also stated that he observed Defendant Merwin try to insert his penis in A.P.’s anus by having A.P. -sit on his lap. At some point, J.G. explained that Defendant Merwin’s wife woke up and came into the living room. -He explained .that A.P, had all his clothes-off and he tried to pull the “sleeping bag cover” over his body. J.G. told Mr. Dooley that when Defendant Merwin’s. wife walked into the living room she, saw A,P. with all his clothes off, and J.G. pulled up his .shorts. Defendant Mer-win’s wife then told Defendant Merwin to go to bed and Defendant Merwin told the boys not to tell anyone about the things he made them do or drink. Further, when Mr. Dooley asked J.G. whether Defendant Merwin ever touched him with any part of his body that night, J.G. said no.
A.P.’s Testimony
-■ A.P. also testified at trial and identified Defendant Merwin in court. A.P. recalled sleeping at Defendant Merwin’s house. He stated that Defendant Merwin “made him suck his pecker and tried to put his thing in my butt.” A.P. also recalled that Defendant Merwin gave him- “something *763 funny” to drink the night he and J.G. slept at Defendant Merwiris house. At trial, A.P. identified the note he wrote to his mother. He also remembered Mr. Dooley interviewing him after the incident.
In the videotaped interview, A.P. explained what occurred after everyone went to bed. He stated that -Defendant Merwin put porn, specifically recalling [ fi“pornhub,” on the television in the living room and on his phone. A.P. noted that his brother was present during this time and was on the couch. A.P. told Mr. Dooley that he was only wearing boxers to sleep in that night, and , at some point Defendant Mer-win told A.P. to take all his clothes off. A.P. also described how Defendant Merwin made him perform oral sex. He stated that Defendant Merwin placed his hand on A.P.’s head “to make [A.P.] go all the way down” on Defendant Merwin. He explained to Mr. Dooley that he did not want to do it, but that Defendant Merwin made him. A.P. said it made him feel “nasty” and “like [he] shouldn’t have been doing it.”
Additionally, A.P. explained that after Defendant Merwin made AP. perform oral sex upon him, Defendant Merwin tried to penetrate A.P.’s anus. A.P. stated that Defendant Merwin had a black triangular bottle thát contained “lube.” He told Mr. Dooley that he did not know what “lube” was but thought it was “some kind of lotion.” Defendant Merwin placed the sexual lubricant on his penis and tried to “put it in [his] booty.” He also stated that Defendant Merwin was unable to penetrate him because “it wouldn’t fit.” Therefore, AP. told Defendant Merwin to stop but he did not. At that point, A.P. said Defendant Merwiris wife woke up.
A.P. stated that -when Defendant Mer-wiris wife came into the living room, she saw that he had no clothes on, so he tried to cover up and put his boxers back on. A.P. explained to Mr. Dooley that the porn was still on when she walked into |7the room and asked “what are /all doing.” Defendant Merwiris wife told everyone to go to bed. ■
Further, A.P. described Defendant Mer-win giving him Kool-Aid that was mixed with alcohol. He said it “tasted strong,” so he washed his cup out and got water. In his videotaped interview, A.P. described the alcohol as pink in color and the label said “watermelon vodka.” A.P. explained to' Mr. Dooley that before Defendant Mer-win went to bed that night he-told the boys not to tell dnyone.
Mr. Dooley asked A.P. if he witnessed Defendant Merwin try to touch his young brother J.G. A.P. stated that J.G. was “on the couch playing -with his pecker because [Defendant Merwin] told him to.” However, A.P. denied Defendant Merwin ever touching J.G., stating “nothing really happened [to him] ... I made sure nothing happened.” ’ Moreover, A.P. stated that the first person' he told about that night was his mother when he wrote her a letter.
During cross-examination, A.P. identified a picture depicting him, J.G., his friend Jasmine (Defendant Merwiris daughter), and her dog all sleeping together on the floor. A.P. told his mother about Defendant Merwiris behavior about one month after it occurred. He said he wrote the note to his mother because he did not want to say anything in front of his other brothers and be “made [to look like a] fool.”
Nurse Ann Troy’s Testimony
Nurse Ann Troy (“Nurse Troy”), a forensic nurse practitioner at the Audrey Hepburn Care Center at Children’s Hospital, testified on behalf of the State. Nurse IsTroy identified a-certified copy of A.P.’s medical report memorializing his emergency room visit at Children’s Hospital in *764 November 2013. Further, she testified that she viewed Mr. Dooley’s interviews of A.P. and J.G. prior to speaking with them. She noted that in the interviews, both victims gave clear and detailed descriptions of sexual abuse.
.She testified that A.P.-reported to her that: Defendant Merwin made him touch Defendant Merwin’s genitals and gave him an alcoholic beverage; and his brother witnessed him being sodomized by Defendant Merwin; and was forced to perform fellatio on.Defendant Merwin. She further noted that J.G. reported being forced to put his mouth on Defendant Merwin’s penis and being forced to sit naked on Defendant Merwin’s lap while Defendant Mer-win inserted his penis into J.G.’s anus.
Nurse Troy testified that J.G. was too upset to undergo a physical exam. However, A.P. did submit to the exam,, which included Nurse Troy taking swabs of his mouth and anus. ■ She verified that no clinical findings were made on A.P. Although, she said it was not unusual that there would be no clinical findings of abuse on A.P. after a two month lapse, as in this case, because prepubescent children’s bodies are resilient and heal quickly. Nurse Troy gave a medical diagnosis that the victims were sexually abused.
Sergeant Robert Garofalo’s Testimony
Sergeant Robert Garofalo (“Sergeant Garofalo”) of the St. Bernard Parish Sheriffs Department testified that he was assigned to the juvenile sex crimes unit. |flHe testified that he met with the victims’ parents when they presented to Children’s Hospital with the victims in November 2013. The sergeant testified that he monitored from a separate room the interviews Mr. Dooley conducted- with the victims. Sergeant Garofalo stated that this procedure allows him to gather information as the child reports .it and to ask questions which the interviewer may have missed. After obtaining the background of the case, Sergeant Garofalo prepared an arrest warrant for Defendant Merwin and a warrant to search Defendant Merwin’s residence.
Sergeant Garofalo testified that he and other officers executing the search were looking-for personal'lubricant, alcohol, and pornography at Defendant Merwin’s residence. As a result of the search Of Defendant Merwin’s residence, the officers confiscated a black bottle of Uranus sexual lubricant, a- bottle of Jack Daniel Watermelon Punch, three cell phones, an Xbox 360 console and computer tower.
Ms. Fannie Moran’s Testimony
At trial, defense called Ms. Fannie Moran (“Ms. Moran”), Defendant Merwin’s mother-in-law, who testified that she was the owner of the residence in which the incident occurred. She testified that her daughter, Defendant Merwin, and their two daughters lived with her in Chalmette. Ms. Moran stated that there were always children spending the night at her house, primarily friends of Defendant Merwin’s daughters. At one time, for about six months, her daughter’s friend and the friend’s children lived at her house in Chalmette.
_JjjjShe also recalled that the night the two victims slept over at her house, she, her daughter, Defendant Merwin and their two daughters were in the house also. When, Defendant Merwin was arrested at her house, she stated that the police informed her that Defendant Merwin was charged with molesting the two victims in this case. Prior to the present allegations, Ms. Moran testified that no one ever made accusations of this nature against Defendant Merwin.
Christie Merwin’s Testimony
Defendant Merwin’s wife, Christie Mer-win (“Mrs. Merwin”) also testified for the *765 defense. Mrs. Merwin stated that her family came to know the victims through Defendant Merwin’s friendship and working relationship with the victims’ 'father. The victims were at her house almost every'day after they became friends with her children. She added that the victims were bad, destructive and unruly children, who lied all the time. At some point the victims and their family moved away, but later returned. Mrs. Merwin testified that in August 2013, she invited the victims to spend the night because her children had not seen the victims since they moved. At trial she identified for the jury the photo she took of the victims the night they slept at her house. She indicated that the picture depicted the two victims in a bed made on the floor with her daughter sleeping.
Remembering the night in question, Mrs. Merwin said she saw Defendant Mer-win with the victims earlier in the evening. However, at about 1:30 a.m., after she and Defendant Merwin had fallen asleep' in their bedroom, she awoke to find the victims in her bedroom looking at the fish tank. She sent the children back to 1 nthe living room where they were supposed to sleep • and later checked on them. They were still awake at about 3:00 a.m. when she ordered them to go to sleep. However, before leaving'the living room, she noticed that AJP.'was holding personal lubricant he had removed from her bedroom. She returned the lubricant to her nightstand, next to her bed. The following morning, her mother was the first to rise. They ate breakfast with the children and waited for the victims’ parents to come get them. The victims asked her if they could sleep over the next night, but she said no.
Mrs. Merwin also testified that at one time she found a text message on Defendant Merwin’s cell phone that indicated that Defendant Merwin and the victims’ mother were having an affair at the time of the incident.
Jasmine and Savannah Merwin’s Tésti-mony
Defendant Merwin’s two daughters also. testified. Jasmine testified that she knew the victims as friends of the family. She said that the victims never listened to their parents and always misbehaved. On the night of the incident, Jasmine recalled that the victims played Xbox. She fell asleep, and later her mother woke her to go to bed, which she did. The next morning her iPod was missing from her bedroom. She stated that she learned A.P. took her iPod and changed the password, and when she finally gained access to the iPod’s contents she found' pornography. Other than her iPod missing from her bedroom, Jasmine did not notice or hear anything unusual when the victims spent the night.
| ^Defendant Merwin’s other daughter Savannah testified that she knew the victims but did not like them because they picked on her and hit her. She also testified that neither her'father nor anyone else had ever touched her inappropriately.
William Montelius’ Testimony
The defense also called William Monteli-us (“Mr. -Montelius”), a friend of Defendant Merwin, .He testified that through his friendship with Defendant Merwin he came to know the victims and their parents. He stated that he was aware-that Defendant Merwin was having an affair with the victims’, mother. He also testified that his two minor children often spent the night at Defendant Merwin’s house, and his children have never reported that Defendant Merwin ever acted inappropriately with them. He testified that he would have.. no hesitation about his children spending time with Defendant Merwin.
On cross-examination, the State questioned Mr. Montelius about' the purpose of *766 his testimony and whether he was there to testify to Defendant Merwin’s good character. Mr. Montelius responded in the affirmative. Additionally, Mr. Montelius was asked if he was aware that Defendant Merwin watches pornography, that he was convicted of breaking into someone’s house on two separate occasions, that he was convicted of a weapons charge^ that he allegedly had an affair with his stepmother, and that he was arrested for beating up his stepmother.
Defense counsel objected to the line of questions as it related to the alleged domestic abuse of Defendant Merwin’s stepmother. Counsel argued that the State | lswas confusing Defendant Merwin with his father, who shares the same ñame. The trial court later admonished the jury not to consider that Defendant Merwin beat up his stepmother after it was learned that it was actually Defendant Merwin’s father, David Merwin, Sr., who had committed the offense.
Defendant Merwin’s Testimony
Defendant Merwin also testified at trial in his own defense. At the time of trial, Defendant Merwin stated he was thirty-four years old and married to Mrs. Merwin for fourteen years. ■ Together they have two daughters, Jasmine and' Savannah, who were thirteen' and nine years old, respectively. He testified that he was a welder by trade and held nine certifications in welding.
Defendant Merwin testified that he and Ms. A.P., the victims’ mother, had an affair for about a year but it ended when Ms. A.P. became “too serious.” He explained that Ms. A.P. did not take the break up well. Defendant Merwin further testified that his wife found out about the affair at the time he was arrested in relation to the present case. However, he noted that the affair ended about one year prior to A.P. and J.G. spending the night at his house; Defendant Merwin admitted to three felony convictions; although, he stated those convictions occurred when he was about nineteen years old. Defendant Merwin testified that A,P. and J.G. only spent one night at his house. Additionally, Defendant Merwin denied any inappropriate behavior with the victims.
1 uNurse Troy’s Rebuttal Testimony
After the defense rested, the State recalled Nurse Troy as a rebuttal witness. The State questioned Nurse Troy about the indicators she uses to determine whether a child has been coached by an adult to lie during the interview. Nurse Troy acknowledged sometimes children do lie and state facts they are coached to say. For that reason, she and her colleagues look for “red flags,” signaling that a child has been coached to lie. Ms. Troy stated that “while children lie, they do so to get out of trouble, "not to get into trouble.” Moreover, Ms, Troy indicated that she saw nothing in this case that demonstrated that the victims’ mother coached the victims to lie.
After both sides presented its case, the jury found Defendant Merwin guilty as charged on all counts. In April 2015, the trial judge sentenced Defendant Merwin to life imprisonment at hard, labor without benefit of parole, probation or. suspension of sentence for aggravated i*ape; fifty years at hard labor, with at least forty years of the sentence to be served without benefit of probation, parole or suspension of sentence on the molestation conviction; and twelve years at hard labor with five years to be served without benefit of parole, probation or suspension of sentence for indecent behavior with a juvenile and for all sentences to be served concurrently. Defendant Merwin timely filed his appeal.

ERRORS PATENT

A review for errors patent on the face of the record reveals none.
*767 I STANDARD OF REVIEW
In his sole assignment of error, Defendant Merwin claims he was denied effective assistance of counsel because the State was allowed to present the jury with inadmissible and prejudicial evidence. Generally, the issue of ineffective, assistance of counsel is a matter more properly addressed in an application for post-conviction relief, filed in the trial court, where a full evidentiary hearing can be conducted. State v. Prudholm, 446 So.2d 729, 737 (La.1984). Only if the record discloses sufficient evidence to rule on the merits of the claim do the interests of judicial economy justify consideration of the issues on appeal. State v. Seiss, 428 So.2d 444, 449 (La.1983). In this case, we find the record is sufficient to review Defendant Merwin’s claim.
In Strickland v. Washington, 466 U.S. 668, 104 S.Ct. 2062, 80 L.Ed.2d 674 (1984), the Supreme Court of the United States articulated a two-part test for determining the effectiveness of a criminal defendant’s counsel:
First, the defendant must show that counsel’s performance was deficient. This requires showing that counsel made errors so serious that counsel was not functioning as the counsel’ guaranteed the defendant by the Sixth Amendment. Second, the defendant must show that the deficient performance prejudiced his defense. This requires a showing that counsel’s errors were so serious as to deprive the defendant of a fair trial. Unless a defendant makes both showings, it cannot be said that the conviction resulted from a breakdown in the adversary process that renders the result unreliable.
Id., 466 U.S. at. 687, 104 S.Ct. 2052, 80 L.Ed.2d 674.
Louisiana courts have adopted the two-pronged test established in Strickland for determining the effectiveness of counsel. In State v. LaCaze, 99-0584 (La.1/25/02), 824 So.2d 1063, the Louisiana Supreme Court discussed the effective assistance of counsel that a criminal defendant is afforded: : . ,
hfiThe Sixth Amendment.-does not guarantee “errorless counsel [or] counsel judged ineffective by hindsight,” but counsel reasonably-likely to render effective assistance. Judicial scrutiny must be “highly deferential” and claims of ineffective assistance are to be assessed on the facts of the particular case as seen from “counsel’s perspective at the time,” hence, courts must indulge “a strong presumption that' counsel’s conduct falls within the wide range of reasonable professional assistance.” ' '
Id., 99-0584, p. 20, 824 So.2d at 1078-79 (footnotes omitted.)
“Hindsight is not the proper perspective for- judging- the competence of counsel’s trial decisions. Neither may an attorney’s level of representation be determined by whether a particular strategy is successful.” State v. Brooks, 505 So.2d 714, 724 (La.1987). If trial counsel’s actions fall “"within "the ambit of trial strategy,” they do not establish ineffective assistance of counsel. State v. Bienemy, 483 So.2d 1105, 1107 (La.App. 4th Cir.1986).

POST-ARREST RIGHT TO REMAIN SILENT

In this case, Defendant Merwin asserts that defense counsel’s failure to object with respect to three situations allowed the State to ask improper" questions and elicit inadmissible and highly prejudicial responses. First, he argues that testimony regarding his post-arrest right to remain silent was admitted in violation of Doyle v. Ohio, 426 U;S. 610, 96 S.Ct. 2240, 49 L.Ed.2d 91 (1976). In support of his argu *768 ment, Defendant Merwin cites the following colloquy which occurred during cross-examination:
• Q. • Did you ever tell you wife, Christie, not to talk to authorities?
A. No sir. I was not the one who told her not to talk to the authorities. I have no reason for her not to want to talk to the authorities.
Q.' What you’re telling this jury is that you encouraged her to go talk to the deputies and fell them what she saw so that would clear you?
[[Image here]]
Q. Did you tell Christie to go talk to the authorities? Are you telling this jury that you told Christie, “Go tell them what happened because if you tell them what happened, they’ll know I’m not guilty?”
A. No. I never told her not to go talk to the authorities.
Q. My question was: Did you tell her-to go talk to the authorities? • - $ ⅜ 1 ⅜
Q. , Did you ask [defense counsel] to go with her , to tell the authorities, to tell the St. Bernard Parish Sheriffs Department what she .saw’ or anything that would clear you of these charges?
A. No. For the same reason we didn’t know we can do that.
Q. In fact, you told her not to talk to the authorities.
A. I never told her not to talk to the authorities.
Q. Now, and just so we’re clear on the authorities, I’m talking about the St. Bernard Parish Sheriffs Department—
A. Yes.. I know what the authorities are.
Q. —the prior administration before Mr. Nicosia got.elected in November—
A. Yes, sir.
Q. —and the current administration after Mr. Nicosia got elected; so we’re talking about three separate authorities that you’re admitting you never told her to go talk to?
A. I did not tell her not to go talk to the authorities.
In the instant case, the silence about which the State questioned. Defendant Merwin during, cross-examination pertained to his wife’s silence, not his, by refusing to give the police a statement subsequent to Defendant Merwin’s arrest. Consequently, Defendant Merwin’s reliance on Doyle is misplaced. “Doyle precludes the State from impeaching a defendant’s testimony at trial with, evidence that he remained silent immediately after his arrest and after receiving. the warnings required by Miranda v. Arizona, 384 U.S. 436, 86 S.Ct. 1602, 16 L.Ed.2d 694, (1966).” State v. Richards, 99-67, p. 1 (La.9/17/99), 750 So.2d 940, 940 (emphasis added). The. Louisiana Supreme Court found that “Doyle rests on the premise that Miranda warnings render the subsequent silence of a defendant ‘insolubly ambiguous’ and thereby make later use of that silence to impeach his or her exculpatory testimony at trial fundamentally unfair.” Id. (internal citations omitted) (emphasis added).
Even if this case presented a Doyle error, this type of trial error does not provide grounds for reversal of a defendant’s conviction and sentence unless it affects substantial rights of the accused. La.C.Cr.P. art. 921; State v. Johnson, 94-1379 (La.11/27/95), 664 So.2d 94. The test is whether there is a reasonable possibility the error might have contributed to the conviction and whether the court can declare a belief that the error is harmless beyond a reasonable doubt. Chapman v. California, 386 U.S. 18, 87 *769 S.Ct. 824, 17 L.Ed.2d 705 (1967); State v. Juniors, 03-2425 (La.6/29/05), 915 So.2d 291. The reviewing court must find the verdict actually rendered by this jury was surely unattributable to the error. Sullivan v. Louisiana, 508 U.S. 275, 279, 113 S.Ct. 2078, 2081, 124 L.Ed.2d 182 (1993).
A trial error, which is an “error which occurred during the presentation of the case to the jury,” may “be quantitatively assessed in the context of other evidence presented in order to determine whether its admission was harmless beyond a reasonable doubt.” Arizona v. Fulminante, 499 U.S. 279, 308-309, 111 S.Ct. 1246, 113 L.Ed.2d 302 (1991). Some constitutional trial errors “which in the setting of a particular case are so unimportant and insignificant that they may, consistent with the Federal Constitution, be deemed harmless ... [and do. not 119require an] automatic reversal of the conviction.” Chapman v. California, 386 U.S. 18, 22, 87 S.Ct. 824, 17 L.Ed.2d 705 (1967).
In this ease, the jury heard the State- cross-examine Defendant Merwin’s wife and witnessed her categorically deny that Defendant Merwin told her not to speak to authorities. Moreover, the jury heard Mrs. Merwin explain that she refused to give a statement without the assistance of counsel and also that because she did not know how the criminal justice system worked, she was unaware that she could provide any information to the police investigation. Likewise, Defendant Mer-win denied discouraging his wife’s cooperation with the authorities.
Defendant Merwin has not provided any authority in support of his position that the State impermissibly commented on his post-arrest silence owing to his failure to direct his wife to protest, his innocence to the authorities, other than to argue in his brief that “if a defendant’s failure to protest his innocence cannot be used against him in front of a jury, it necessarily follows that his failure to direct his wife to go to authorities to protest his innocence on his behalf is equally abhorrent to our American system of justice.”
Further, the evidence of Defendant Merwin’s guilt presented at trial was the basis of the jury’s verdict, not his trial counsel’s failure to object to the portion of the wife’s testimony on cross-examination that Defendant Merwin points to on appeal. The victims consistently reported the specifics of Defendant Merwin’s actions. Their accounts of the night in question never deviated from their first report of abuse to their mother through their testimony at trial. Their consistent version, of the facts, relating to the alcoholic beverage Defendant Merwin had them to drink and the pornography Defendant Merwin made them watch, to their identification of the personal lubricant Defendant Merwin used to rape A.P. was ^substantiated by the search for, and seizure of, the foregoing evidence from Defendant Merwin’s residence.. If there was error, which we do not find, the evidence of Defendant Merwin’s guilt was the basis of the jury’s verdict. We find no merit to Defendant Merwin’s argument.

PRIOR FELONY CONVICTIONS

Defendant Merwin also claims the trial counsel’s failure to object to, the State’s cross-examination of defense witness, William Montelius, led to inadmissible and highly prejudicial responses. He points to the State’s questioning of Mr. Montelius regarding his knowledge of Defendant Merwin’s previous felony convictions. He contends that because Mr. Montelius was hot a character witness the trial court should not have permitted the State to question him about whether he was aware *770 of Defendant Merwin’s criminal past to rebut Mr. Montelius’ direct testimony.
In State v. Robinson, 09-1137, p. 7-8 (La.App. 4 Cir. 3/24/10), 33 So.3d 1019, 1023, this Court held:
A witness may be cross-examined on any matter relevant to any issue in the case. La. C.E. art. 611. Character witnesses may be cross-examined concerning relevant specific instances of conduct. La. C.E. art. 405. The State has the right to rebut testimony elicited from a witness by'the defense.
Contrary to Defendant Merwin’s contention, Mr. Montelius was in fact a character witness on behalf of the defense. On appeal, Defendant Merwin claims that Mr. Montelius was called as a fact witness to testify to his awareness of Defendant Mer-win’s affair with the mother of the victims. However, Mr. Montelius also testified that he and Defendant Merwin wére good friends and that his own children often spent the night at the Merwin residence. He testified that [^neither of his children ever gave him reason to believe that Defendant Merwin had ever, touched them inappropriately.
The fact that evidence of Defendant Merwin’s -criminal history was introduced before Defendant Merwin testified at trial is irrelevant in this case. During the presentation of its case, defense called Mr. Montelius. After Mr. Montelius testified that he and Defendant Merwin were close friends and had no reason to believe Defendant Merwin ever touched Mr. Mon-telius’ children inappropriately, the door was opened to permit the State to rebut testimony of Defendant Merwin’s' character by questioning Mr. Montelius about Defendant Merwin’s prior convictions. Moreover, Mr. Montelius admitted on cross-examination that he appeared in court to testify to Defendant Merwin’s good character.
During the course of Mr. Montelius’ cross-examination, the State asked Mr. Montelius if he was"aware of Defendant Merwin’s convictions for breaking into someone’s home on two different occasions, having an affair with his stepmother, and allegedly “beating up” his stepmother. Defendant Merwin avers on appeal that his trial counsel posed no objection to the State’s line of questioning and the responses it elicited. However, like Robinson, once Mr. Montelius testified to evidence of Defendant Merwin’s character the State was allowed to rebut his testimony with questions regarding Defendant Merwin’s prior convictions. Thus, any failure of trial counsel to object was harmless.[5]
Nevertheless, Defendant Merwin also takes issue with his trial counsel’s failure to object to the State’s questioning of Mr. Montelius with. respect to ^allegedly beating up his stepmother. The trial transcript indicates, however, that defense counsel moved for a mistrial based on the State confusing the rap sheets of Defendant Merwin with those of his father, who shares the same name.
The trial court held a hearing the next morning on the motion for mistrial outside the presence of the jury. Defense counsel argued that the State.confused Defendant Merwin with having “beat up his stepmother.”[6] Counsel argued that -when *771 cross-examined with this information Mr. Montelius “didn’t know what [the State] was talking about, and he looked like a liar in front of the jury;” and as a result the jury was tainted. The State conceded that it confused “David Merwin, Sr.” with Defendant Merwin (David Merwin, Jr.); however, it was willing to stipulate to the jury its mistake. The trial court denied Defendant Merwin’s motion for mistrial and denied his request to inform the jury of the “identifying factors on the rap sheet that were ... confused.” Instead, the trial court admonished the jury.not to consider the State’s line of questioning that indicated that Defendant Merwin beat up his stepmother. Additionally, all jurors indicated they understood the trial court’s instruction.
A trial judge has broad discretion in granting a motion for mistrial and should not be granted unless the defendant demonstrates a clear showing of prejudice. State v. Leonard, 05-1382, p. 11 (La.6/16/06), 932 So.2d 660, 667. Furthermore, a harmless ei-ror analysis is applied as “an appellate court will not reverse a defendant’s conviction .or sentence unless the error affects the substantial rights of the accused.” Id.; See also La.C.Cr.P. art. 921. Though it is arguable that | ^the State’s line of questions and Mr. Monteli-us’ responses could have led the jury to believe Mr. Montelius was lying, any prejudicial effect was cured when the trial court instructed the jury not to consider that Defendant Merwin beat up his stepmother as it was not Defendant Merwin who committed the offense, but his father, David Merwin, Sr.
In that we find the State is allowed to rebut character witness testimony with evidence of a defendant’s prior convictions, we find trial counsel’s failure to object on those grounds does not demonstrate that counsel’s performance was so deficient as to deprive Defendant Merwin a fair trial. Furthermore, we find the trial court’s admonition to the jury cured any prejudicial defect that resulted from the State’s line of questioning.-on cross-examination of Mr. Montelius relating to Defendant Merwin beating up his stepmother. Based upon Defendant Merwin’s failure to prove prejudice as to this issue, we next address Defendant Merwin’s third complaint on appeal.

REBUTTAL TESTIMONY

Defendant Merwin claims trial counsel failed to object to the rebuttal testimony, of the State’s expert witness, Nurse Troy, and her opinion that the victims did not appear coached when recounting the sexual abuse. Nurse Troy stated that the victims gave clear, detailed information of Defendant Merwin’s actions, and she did not detect any deceptíón on the part of the victims. Defendant Merwin claims that Nurse Troy’s expertise in child sexual abuse did not qualify her to make such an assessment,' as only the jury is allowed to assess credibility. Further, he maintains that because the entire prosecution turned solely on the ^credibility of the two victims, Nurse Troy’s testimony constituted her -opinion that Defendant Merwin'was guilty of the crimes charged, which was impermissible. '
Contrary to Defendant Merwin’s protestation that Nurse Troy was allowed to render an opinion of his guilt, the following exchange occurred between the State and Nurse Troy:
Q. Have you ever taken a history that raised concerns for being coached to state certain facts?
A. It’s one of the things that we keep on our differential when we’re talking to children, and we’re always looking for any read flags that would indicate that a child had been coached to say a certain *772 things to us because then that would be emotional abuse by the parent who brought them to us; so it is always on our radar. And' we know that children lie, but children lie to get out of trouble, not to get into trouble; so we are very much aware of it and looking for those red flags when assessing children and families.
Q. Did you see any of the red flags in this particular case?
A. No. I saw nothing in this case that had me calling child protection and filing any complaint against this mother.
As the foregoing exchange indicates, Nurse Troy did not render an opinion as to Defendant Merwin’s guilt. She was asked whether she detected any signs that the victims 'were coached in their accounts of Defendant Merwin’s offenses. She stated that she found no evidence of coaching by the victims’ mother. There is no merit to this argument.

DECREE

We find Defendant Merwin has failed to show that his trial counsel’s failure to object led to the admission of highly prejudicial and inadmissible evidence. Furthermore, the record demonstrates that the jury’s verdict was based on substantial evidence presented at tidal and not- trial counsel’s performance. Accordingly, we find no merit to Defendant Merwiris ineffective assistance of | ^counsel claim. Based on the foregoing reasons, we affirm Defendant Merwin’s convictions and sentences.
AFFIRMED

. The bill of informaticm filed on February 27, 2015, charged Defendant Merwin with one count of indecent behavior with a-juvenile in violation of La. R.S. 14:81(A)(1) and (H)(2). However, subsection (H)(2) is the associated sentencing provision. Thus, only subsection (A)(1), defining the offense charged, applies for purposes of the bill of information.

. The indecent behavior with a juvenile charge was originally filed in a separate bill of information; however, it was later consolidated for trial with the aggravated rape and molestation charges.

. Pursuant to La. R.S. 46:1844(W)(3), the victim and any witness whose name can lead to the victim’s identity, i.e. parent, sibling, or relative with the same last name as the victims, will be identified by initials only. To differentiate between the victim A.P. and his mother, who share the same initials, A.P.’s mother will be referred to as a "Ms. A.P.”

. Each victim’s recorded interview was played for the jury following each victim's respective testimony.

. We also note that when Defendant Merwin testified defense counsel questioned him about his prior convictions and admitted to the court before the jury that he had three prior felony convictions.

. Defense counsel noted that the rap sheet relating to the offense including birth dates, social security numbers, and fingerprints did riot comport with Defendant Merwin's identity.