# United States Court of Appeals
## For the First Circuit

No. 05-1650

UNITED STATES OF AMERICA,

Appellee,

v.

TAVON ROBINSON,

Defendant, Appellant.

APPEAL FROM THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF MASSACHUSETTS

[Hon. Patti Saris, U.S. District Judge]

Before

Lynch, Circuit Judge,
Siler,* Senior Circuit Judge,
and Lipez, Circuit Judge.

Ben T. Clements, with whom Ingrid S. Martin and Clements & Clements, LLP, were on brief, for appellant.
Cynthia A. Young, Assistant United States Attorney, with whom Michael J. Sullivan, United States Attorney, was on brief, for the United States.

January 11, 2007

---

*Of the Sixth Circuit, sitting by designation

**SILER**, <u>Senior Circuit Judge</u>. Defendant Tavon Robinson was convicted of conspiracy to possess with intent to distribute and to distribute cocaine, 21 U.S.C. § 846; possession with intent to distribute and distribution of cocaine, 21 U.S.C. § 841(a)(1); being a felon in possession of a firearm, 18 U.S.C. § 922(g)(1); and possessing a firearm in furtherance of a drug trafficking offense, 18 U.S.C. § 924(c)(1)(A).

Robinson appeals both firearms convictions and his sentence, alleging prosecutorial misconduct, insufficient evidence, and improper sentencing. We AFFIRM.

## I.

In 2004, DEA Special Agent David DiTullio agreed to purchase two ounces of crack cocaine for $2,350 from Adam Ellard as part of an undercover drug investigation. Unable to locate any crack cocaine for the deal, Ellard contacted Willie Hester, whom he had seen packaging crack on a previous occasion with another man, Norman Barnes. Hester agreed to sell Ellard sixty-two grams of crack cocaine, but conditioned the sale on his accompanying Ellard to the deal.

Hester picked up Ellard in a Honda, followed by a Ford[1] with New Hampshire plates. The Ford had three occupants: Robinson in the driver's seat, Stephen Tucker in the front passenger seat, and

_____

[1]The Ford was rented to Cleo Mercer, the sister of Stephen Tucker.

Barnes in the back. The two cars traveled to a parking lot in Dorchester to complete the deal with DiTullio. Ellard exited the Honda and entered the passenger side of DiTullio's vehicle. He told DiTullio that the crack cocaine was in the Ford and requested the $2,350. DiTullio showed Ellard the money, let him count it, but would not give it to him unless he produced the crack cocaine. Ellard returned to the Honda to consult with Hester, who told him to go speak with Barnes in the Ford. Barnes informed Ellard he would not produce the drugs without any money. In an attempt to compromise, Ellard had DiTullio back his vehicle up to the rear of the Ford. DiTullio again refused to give Ellard the money without the drugs.

Frustrated at the stalled deal, Robinson exited the driver's seat of the Ford, walked to the front of the hood for a few moments,[2] and then proceeded to DiTullio's vehicle. Speaking with DiTullio through the passenger window, Robinson removed a clear

---

[2]Conflicting testimony was presented at trial regarding Robinson's conduct in exiting the car and moving to the front of the hood. Ellard testified that Robinson unlatched the hood from inside, reached between the hood and the grill stating, "I'm looking for something," but closed the hood without removing anything. DEA Group Supervisor Richard Guerard, who conducted surveillance of the transaction, testified that Robinson opened the hood "about five or six inches" and then closed it. DiTullio testified that Robinson opened the hood approximately one-quarter of the way, removed an item and put it in his jacket pocket. Agent Steven Story, who also conducted surveillance, testified that Robinson opened the hood approximately eighteen inches, but shut it without removing anything.

plastic bag[3] from his jacket pocket and placed it on the front passenger seat. DiTullio gave Robinson the money, and Robinson began walking back to the Ford. As law enforcement officers moved in for an arrest, Robinson fled briefly before being apprehended. He was arrested and police found $2,350 and a clear plastic bag containing marijuana and crack cocaine in his possession.

After seizure of the Ford, an inspection at a garage revealed two loaded semiautomatic pistols wrapped in a T-shirt and hidden inside a small space in front of the engine compartment near the front of the hood.[4]

The next day, Officer Conners overheard Robinson and Barnes conversing in their shared holding cell. According to Officer Conners, Robinson remarked to Barnes, "It's not crack anyway. It's only coke. They'll find that out when they do the lab tests." Officer Conners also heard Robinson tell Barnes that "When they came from everywhere, I could have gone boom, boom."

At trial, in his opening statement, Robinson's counsel admitted his client's guilt on the drug charges,[5] but argued that

---

[3]The parties stipulated at trial that the clear plastic bag contained 28.2 grams of crack cocaine.

[4]Agent Story testified that Robinson would have access to the space where the pistols were hidden with the hood partially open. Gloucester Police Officer Sean Conners also testified that the space was accessible if the hood was only open three to six inches.

[5]Robinson pled guilty to the drug charges on the morning of the third day of the trial.

he was unaware of the firearms' presence.  Robinson was convicted on both firearms charges.  The district court denied Robinson's motion for judgment of acquittal and sentenced him to 137 months.[6]

**II.**

Claims for prosecutorial misconduct are reviewed under the harmless error standard if the defendant contemporaneously objected to challenged statements.  United States v. Auch, 187 F.3d 125, 128-29 (1st Cir. 1999).  If no objections were made, challenged statements are reviewed for plain error.  United States v. Sanchez-Berrios, 424 F.3d 65, 73 (1st Cir. 2005).  We review de novo whether a challenged statement by the prosecutor during closing argument was improper.  Whether the misconduct, if any, warrants a new trial is reviewed for an abuse of discretion.  United States v. Nelson-Rodriguez, 319, F.3d 12, 38 (1st Cir. 2003).

We review claims of insufficient evidence de novo.  United States v. Hall, 434 F.3d 42, 49 (1st Cir. 2006).  A conviction will be affirmed "if, after assaying all the evidence in the light most amiable to the government, and taking all reasonable inferences in its favor, a rational factfinder could find, beyond a reasonable doubt, that the prosecution successfully proved the essential elements of the crime."  United States v. Perez-Gonzalez, 445 F.3d

---

[6]Robinson was sentenced to 77 months concurrently for the drug charges and being a felon in possession of a firearm.  He was also sentenced to 60 months for possessing a firearm in furtherance of a drug trafficking offense.

39, 48 (1st Cir. 2006). We also review <u>de novo</u> claims that the district court committed errors of law at sentencing. <u>United States</u> v. <u>Pho</u>, 433 F.3d 53, 60 (1st Cir. 2006).

**III.**

Robinson raises three issues on appeal: prosecutorial misconduct, insufficient evidence, and improper sentencing. We address each issue in turn.

A.

Robinson's first argument is that the prosecution repeatedly engaged in a pattern of misconduct during both cross-examination and closing argument when it systematically portrayed him as a habitual drug user and career drug dealer. He contends that the government's questions about the drug deal with DiTullio and repeated questions and references to his prior history of drug trafficking constitute reversible error because they confused the jury into convicting him on the gun charges based mostly on his prior history of drug trafficking.

Robinson argues that the government improperly elicited prejudicial testimony regarding the drug deal with DiTullio. According to Robinson, such testimony was unnecessary because he never challenged his guilt: defense counsel informed the government prior to trial that he would not deny his role in the drug deal with DiTullio, defense counsel's opening statement conceded his guilt to the drug trafficking charges, at no time during the trial

did he otherwise contest his guilt, and on the morning of the third day he entered guilty pleas to both drug charges. Thus, he argues, the government was relieved of its burden to prove that Robinson engaged in drug trafficking as part of its charge that he possessed a firearm in furtherance of a drug trafficking offense. Robinson contends that the sole reason the government focused on this drug deal was to make the jury believe it was to convict him for his drug trafficking activities and not the firearms charges.

This argument is unavailing for several reasons. First, although he conceded his role in the drug deal with DiTullio prior to trial and during his opening statement, Robinson remained free to change his mind whether he would contest both drug trafficking charges at some point in the trial. He did not formally enter guilty pleas to both charges until the morning of the third day of trial, and until that time the government still had the burden to prove his guilt beyond a reasonable doubt. Therefore, it was proper to present evidence that Robinson engaged in drug trafficking.

Robinson claims the government also engaged in misconduct when it repeatedly questioned him about his prior drug use and involvement in drug trafficking during his cross-examination and when it returned to this theme in closing arguments. He argues that these questions and closing statements constitute misconduct and violate FED. R. EVID. 404(b).

-7-

On several occasions during Robinson's cross-examination, the government attempted to question him about his history in dealing and using drugs.[7] At a sidebar after repeated defense objections, the government told the district court that it was not inquiring about prior bad acts, but rather showing that Robinson knew about the dangers of dealing drugs in order to prove the "in furtherance" element of possessing a firearm in furtherance of a drug trafficking offense. Several times after the sidebar, the government again attempted to ask Robinson about his drug dealing history in an effort to prove why he would bring a gun to a drug deal and how he knew prices of drugs.

Evidence of "a defendant's other bad acts [is proper] only if that evidence meets the requirements of both Rule 404(b) and Rule 403." United States v. Tse, 375 F.3d 148, 155 (1st Cir. 2004). Rule 404(b) evidence must be "specially relevant" and cannot "include bad character or propensity as a necessary link in the inferential chain." United States v. Flemmi, 434 F.3d 7, 12 (1st Cir. 2005). Even assuming that the district court properly excluded the government's questions to Robinson about his prior history, Robinson cannot show prejudice from these questions.[8]

---

[7]Robinson objected to some questions along this line, but not all.

[8]Because of Robinson's inconsistent objections to this line of questioning, the plain error and harmless error standards apply to different questions. However, as discussed infra, Robinson cannot make a showing of prejudice under the lesser harmless error

Robinson claims that the mere asking of these questions was prejudicial. See United States v. Meserve, 271 F.3d 314, 326 (1st Cir. 2001) ("[T]he question itself may nevertheless prejudice a defendant because of the weight a jury gives to the questions asked by a prosecutor."). However, Robinson never answered many of the questions because the court sustained his objections. Thus, the required showing of prejudice becomes more difficult. See id. (noting that where challenged questions are left unanswered, the harmless error analysis is likely to weigh in favor of the appellee); see also United States v. Inamorati, 996 F.2d 456, 485 (1st Cir. 1993) (prejudicial effect of challenged questions lessened when questions were not answered).

In response to a question asked without objection, Robinson admitted that it was not out of the ordinary for him to be selling drugs. Moreover, on the third day of the trial, Robinson pled guilty to the two drug charges. At this point, the jury had heard considerable evidence regarding Robinson's drug deal with DiTullio. Therefore, it is difficult to see how the questions prejudiced Robinson.

Robinson cites to two main cases to support his contention that reversal is required. However, these cases are distinguishable. First, he cites United States v. Crawford, 438 F.2d 441 (8th Cir. 1971). In that case, the prosecution asked

standard.

questions insinuating that the defendant was a member of a group of narcotics users and sellers. The court found reversible error, in part, because the only purpose in asking those questions was to "degrade the defendant and to prejudice the jury against him." Id. at 444-45. Here, the government did have a legitimate purpose in asking the questions: to provide the jury with a reason why Robinson would bring a firearm to a drug deal. The misconduct inherent in the baseless attacks in Crawford is not present here.

Robinson similarly cites to United States v. Newman, 49 F.3d 1 (1st Cir. 1995). In that case, we found error in the government's questions of whether the defendant knew what a "con man" or "confidence game" was. As was the case in Crawford, we found the government had "no justifiable purpose for that line of questioning, other than, as [the defendant] suggests, to discredit him by insinuation." Id. at 8. Again, the same is not true here because the government did have a legitimate reason for pursuing its line of questioning.

Robinson next claims the prosecution committed reversible error when it asked him on cross-examination whether two law enforcement witnesses lied on the witness stand. Agent Genese had testified that when he asked Robinson whether he knew the cocaine he sold to DiTullio was real or fake, Robinson responded that he did not know. During Robinson's cross-examination, he denied

saying that he was unsure what he sold. The prosecution then asked him if Agent Genese was lying.[9]

At another point, Officer Conners testified that he heard Robinson state that when the officers surrounded him just prior to his arrest, he could have gone "boom, boom." During Robinson's cross-examination, he denied making the statement and responded that Officer Conners could have been mistaken. The government then asked Robinson if Conners was lying, to which he answered that he did not know and was unable to say.[10]

"This Court has held it is improper for an attorney to ask a witness whether another witness lied on the stand." United States v. Thiongo, 344 F.3d 55, 61 (1st Cir. 2003) (citing United States v. Gaines, 170 F.3d 72, 81 (1st Cir. 1999)) (noting that such practice is improper because credibility judgments are for the jury). Furthermore, "[g]iven the faith that the jury may place in the word of a law enforcement officer, it is unfair to force a criminal defendant to choose between recanting and calling a law officer a liar." United States v. Fernandez, 145 F.3d 59, 64 (1st Cir. 1998).

Because Robinson objected to the government's question asking whether Agent Genese was lying, it is reviewed for harmless error.

---

[9]Robinson objected to this question, which the court sustained.

[10]Robinson did not object to this question.

-11-

See United States v. Sullivan, 85 F.3d 743, 750 (1st Cir. 1996) (analyzing a similar question under the harmless error standard). While the question was improper, any resulting error was harmless because the district court sustained Robinson's objection and relieved him from answering. Robinson was not forced "to choose between recanting and calling a law officer a liar." Fernandez, 145 F.3d at 64. The only benefit the government gained from the question was highlighting the discrepancy between the testimony of Agent Genese and Robinson. As was the case in Sullivan, "[t]hat there was a contradiction between [Robinson's] testimony and [Agent Genese's] was obvious. Pointing out the obvious most likely scored the government, at most, rhetorical points." Sullivan, 85 F.3d at 750.

Robinson did not object when the government asked him if Officer Connors was lying. Therefore, we review this question for plain error.[11] See Fernandez, 145 F.3d at 64. "[T]o constitute plain error [the questions] must have affected the outcome of the district court proceedings." Id. The prosecution's question here

_____

[11]The government's question to Robinson whether Officer Conners was "mistaken" was proper. See Gaines, 170 F.3d at 81-82 (citing United States v. Gaind, 31 F.3d 73, 77 (2d Cir. 1994) ("Asking a witness whether a previous witness who gave conflicting testimony is 'mistaken' highlights the objective conflict without requiring the witness to condemn the prior witness as a purveyor of deliberate falsehood, i.e., a 'liar.'")).

was not plain error because Robinson fails to show prejudice.[12]

Similar to the question about Agent Genese's testimony, this question merely drew the jury's attention to the discrepancy between Robinson's and Officer Conner's testimony. Thus, it is difficult to imagine that "the improper framing of these unobjected-to questions affected the outcome of the trial." Fernandez, 145 F.3d at 65.

Robinson also argues that the government continued to impermissibly vouch for the law enforcement officers in its closing argument. In relevant part, the prosecutor argued:

> Ladies and gentleman, if you believe that the officers of the United States, if you believe that these agents got on that stand with all those years of experience and in the face of their oath stood up there and lied in their testimony and you believe they did that, then acquit the defendant. Then acquit the defendant.

Because there was no contemporaneous objection, we review for plain error. United States v. Wilkerson, 411 F.3d 1, 7 (1st Cir. 2005). Improper vouching occurs when the government "place[s] the prestige of the United States behind a witness by making personal assurances about the credibility of a witness," United States v. Rosario-Diaz, 202 F.3d 54, 65 (1st Cir. 2000), or implies "that the jury should credit the government's evidence simply because the government can be trusted." United States v. Perez-Ruiz, 353 F.3d

_____

[12]In fact, Robinson's brief seemingly concedes no inherent prejudice in this particular question. ("While these questions in isolation may not have been reversible error . . . .").

-13-

1, 9 (1st Cir. 2003). The government's statement in this case did neither and does not constitute plain error.

The government's statement merely invited the jurors to acquit Robinson if they believed that Agent Genese and Officer Conners were lying. This is not the type of improper vouching present in Rosario-Diaz or Perez-Ruiz because the government neither made statements about the witnesses' credibility nor implied that they could be trusted based on their affiliation with the United States. Moreover, these statements do not rise to the level of plain error. See Wilkerson, 411 F.3d at 8 (no plain error where prosecutor's rebuttal included statement that officers "didn't stretch the truth here"); Sullivan, 85 F.3d at 751 (no plain error where government's closing argument stated that one witness "came off pretty believable," another "couldn't have lied about anything," and that all of them "were telling the truth").

In addition to arguing that the government improperly vouched for law enforcement witnesses in its closing argument, Robinson alleges other instances of prejudice in the government's summation. Because he failed to object to the government's closing argument, we review for plain error. Sullivan, 85 F.3d at 751. We "will not notice error unless it caused 'a miscarriage of justice' or seriously undermined 'the integrity or public reputation of judicial proceedings.'" United States v. Joselyn, 99 F.3d 1182, 1198 (1st Cir. 1996); see also United States v. Taylor, 54 F.3d

967, 977 (1st Cir. 1995) (referring to this standard as "hard-to-satisfy").

Robinson claims that the government's first statement in its closing argument directed the jury to convict him based on his alleged life of crime rather than his alleged possession of firearms.[13]

While "arguments urging a jury to act in any capacity other than as the impartial arbiter of the facts in the case before it are improper," United States v. Manning, 23 F.3d 570, 574 (1st Cir. 1994), the government's closing argument in this case did not request the jury to act in that manner. "In assaying the appropriateness of a prosecutor's remarks, context frequently determines meaning." United States v. Sepulveda, 15 F.3d. 1161, 1187 (1st Cir. 1993). Here, the discussion following the challenged statement focused on the facts attendant to Robinson's arrest, not to his prior drug dealing. The government then spoke for some time about the fundamentals of the law of the case before it mentioned Robinson and his alleged life of crime. Even when the government did mention his prior history, it constituted only a small portion of the entire summation. Taken in context, the prosecutor's remarks are not plain error.

---

[13]The government's closing argument began: "There comes a time in every man and woman's life that they must be held accountable for their actions. That time for this defendant, Tavon Robinson, is here and now."

Robinson next alleges that the government's closing argument impermissibly returned to his history as a drug dealer. Robinson's brief selectively excerpts sentences from the government's summation and dissects each sentence to arrive at his conclusion that the closing was plain error. However, we must view the context of the remarks in determining whether error exists. <u>Id</u>. Viewed accordingly, these remarks are not plain error. The government's closing argument focused on the uncertainty surrounding the drug deal and the notion that drug dealers, including Robinson, bring guns to drug deals to protect themselves. The government merely repeated what Robinson admitted to, without objection, on cross-examination: that he knew the "ways of the world" and about drug deals in general.

The closest the government came to impermissibly prejudicing the jury in its closing argument was when it concluded its rebuttal:

> I would suggest to you, ladies and gentlemen . . . that [Robinson is] guilty of possessing those guns in furtherance of that drug deal in which anything could have happened and probably something would have happened had it been a real drug dealer and not a DEA undercover agent who was getting ripped off by the defendant.

While it is improper to "needlessly arouse the emotions of the jury," <u>United States</u> v. <u>Pirovolous</u>, 844 F.2d 415, 425 (7th Cir. 1988), by resorting to unsupported hypotheticals, the error here does not result in a "miscarriage of justice." The court instructed the jury that same afternoon that closing arguments were

not to be considered as evidence.  Therefore, the hypothetical was not plain error.  See United States v. Procopio, 88 F.3d 21 (1st Cir. 1996) (no plain error, in light of a curative instruction, despite only circumstantial evidence of guilt and "seriously careless" comment by prosecutor).

Robinson argues that even if any of the alleged prosecutorial errors do not, by themselves, require reversal, the totality of the government's misconduct compels the conclusion that Robinson was denied a fair trial.  We do not accept Robinson's premise that every evidentiary error in a criminal trial amounts to government misconduct.  Nevertheless, for ease, we will use the misconduct test to address his arguments.

We weigh several factors in determining "whether prosecutorial misconduct has so poisoned the well that a new trial is required: (1) the severity of the misconduct; (2) the context in which it occurred; (3) whether the judge gave any curative instructions and the likely effect of such instructions; and (4) the strength of the evidence against the defendant." United States v. Casas, 425 F.3d 23, 38 (1st Cir. 2005), cert. denied, 126 S. Ct. 1670 (2006).  This analysis focuses on the underlying fairness of the trial.  Meserve, 271 F.3d at 332.  In this case, the government's actions do not require reversal.

First, the government's conduct was not as severe as Robinson alleges.  While some of the prosecutor's questions regarding

Robinson's history of drug dealing may have been improper, their sole purpose, unlike in Newman, was not to paint Robinson as an evil character, but to show his motivation for carrying a firearm to a drug deal. The government also appealed to the jury's emotions in closing, perhaps needlessly, but considering the context of the entire closing argument and rebuttal, the statements were not highly prejudicial.

Second, we should look at the time when the alleged misconduct occurred. The government properly elicited testimony about the drug deal with DiTullio because at the time it asked those questions, Robinson had not yet formally pled guilty to those charges. Once Robinson entered a formal guilty plea, the government shifted its focus from the drug deal to the gun possession. Therefore, the government did not cause the jury to be unnecessarily focused on the drug charges and the questions did not heighten prejudice or create confusion as Robinson suggests.

Third, while the district court gave no curative instructions, Robinson requested none. The district court did give general instructions before deliberations regarding what the jury could and could not consider as evidence, including questions with sustained objections, opening statements, and closing arguments.

Finally, evidence of Robinson's guilt was neither exceptionally weak nor exceptionally strong. The government introduced sufficient evidence to convict Robinson on the firearms

charges, but this evidence did require a finding of constructive possession.

Taking these factors together, Robinson was not sufficiently prejudiced to entitle him to a new trial.  The underlying fairness of the trial was not compromised because, although there may have been error, it was not sufficiently linked to the outcome so as to require a new trial.

B.

Robinson next argues that the government failed to produce sufficient evidence at trial to prove that he knowingly possessed a firearm in furtherance of a drug trafficking crime.  He contends that the evidence indicates that he had no role in hiding the guns or was even aware of their existence.

In order to prove possession of a firearm, the government must show actual possession or constructive possession.  Constructive possession "exists when a person knowingly has the power and intention at a given time to exercise dominion or control over the area where the contraband is found."  United States v. McLean, 409 F.3d 492, 501 (1st Cir. 2005) (internal quotations marks and citations omitted).  "[T]he requisite knowledge and intention may be inferred from circumstances . . . . [b]ut knowledge must be fairly inferable from the circumstances."  Id. (citing United States v. Zavala Maldonado, 23 F.3d 4, 7 (1st Cir. 1994)).  "Constructive possession of a firearm may be established by showing

-19-

that the person knows (or has reason to know) that the firearm is within easy reach, so that he can take actual possession of it virtually at will." United States v. Lamare, 711 F.2d 3, 5-6 (1st Cir. 1983).

The evidence was sufficient to permit a rational jury to conclude that Robinson constructively possessed the firearms found in the engine compartment. First, even though the evidence showed that Robinson neither rented the Ford in which the firearms were found, nor owned the firearms,[14] constructive possession does not require ownership of either the guns or the area in which they are located. All that is necessary is that the defendant knowingly have the ability and intent to exercise dominion and control of the firearm or area where it is located. See United States v. Carpenter, 403 F.3d 9, 10 (1st Cir. 2005).

A rational jury could have concluded that Robinson had the ability and intent to exercise dominion and control of the firearms for several reasons. Even though the Ford was rented to Mercer, Robinson's relationship with Tucker provided him with ample opportunity to store the guns in the engine compartment. Evidence was presented that Robinson and Tucker were friends, that Mercer left the keys to the Ford in various locations around the house where Tucker and Robinson would have easy access to them, and that

---

[14]Evidence showed that Tucker purchased one of the pistols from Daniel Clagon.

-20-

Robinson was part of a group who was to drive the Ford to New Jersey for a trip.

Second, a rational jury could have interpreted Robinson's statement to Barnes in the holding cell that "When they came from everywhere, I could have gone boom, boom," to mean that Robinson could have shot the agents using the firearms found in the Ford.

Robinson contends that even if the evidence was sufficient to prove that he knowingly possessed firearms, there was insufficient evidence to prove that he possessed the firearms in furtherance of a drug trafficking offense.

Under 18 U.S.C. § 924(c), the government must prove that the firearm was possessed "to advance or promote the commission of the underlying offense. The mere presence of a firearm in an area where a criminal act occurs is not a sufficient basis for imposing [the] mandatory sentence [under §924(c)]." United States v. Grace, 367 F.3d 29, 35 (1st Cir. 2004). There must be some sufficient nexus between the firearm and the drug trafficking offense. While a sufficient nexus is more readily found in cases where the firearm is in plain view and accessible to the defendant during a drug trafficking offense, see United States v. Felton, 417 F.3d 97, 106 (1st Cir. 2005); United States v. Garner, 338 F.3d 78, 91 (1st Cir. 2003), we have found a sufficient nexus to exist where the drugs and firearms were not jointly located and easily accessible. See United States v. Carlos Cruz, 352 F.3d 499, 509 (1st Cir. 2003)

-21-

(rifles located inside a nearby trash can and covered with blankets while drugs were located on defendant's person).  In these cases, we weigh several factors: whether the firearm was loaded, whether the firearm was easily accessible, the proximity of the firearm to the drugs, and the surrounding circumstances.  Id.

Here, the jury had ample reason to conclude that Robinson possessed the firearms in furtherance of the drug deal with DiTullio.  Both firearms hidden in the Ford were loaded and were accessible by Robinson during the drug deal with DiTullio.  All Robinson had to do to gain actual possession of the firearms was to open the Ford's hood three to six inches and reach inside the engine compartment.  Moreover, because Robinson had the drugs on his person when he was inside the car and subsequently opened the hood, the firearms were within close proximity to the drugs.  Also, a jury could have concluded that Robinson was in charge of the drug deal and that the firearms were available if necessary because Robinson drove the car and took charge when the drug deal appeared as if it would not happen. Therefore, sufficient evidence existed for the jury to find that Robinson possessed the firearms in furtherance of a drug trafficking offense.

C.

Robinson's final claim is that the district court erred at sentencing.  He contends that "[t]he district court erroneously believed it was constrained by the United States Sentencing

-22-

Guidelines ('Guidelines') when it sentenced" him to 137 months. Specifically, he points to the district court's comment that "I think that -- I don't have a whole lot of discretion here. I -- but I don't see any reason to go to the high end of the advisory guideline range. I think 137 is the lowest I can do with the [60-]month consecutively-run sentence," as evidence that the district court misapprehended its discretion under the Guidelines.

Since Booker v. United States, 543 U.S. 220 (2005), we have held that district courts must continue to consider the Guidelines sentencing range in calculating reasonable sentences. United States v. Jimenez-Beltre, 440 F.3d 514, 518 (1st Cir. 2006) (en banc). This consideration should include "the guideline range, any proposed departures, followed by the further determination whether other factors identified by either side warrant an ultimate sentence above or below the guideline range." Id. at 518-19. If a sentence falls outside the Guidelines range, the district court must provide justification, which may be either express or inferred. Id. at 519.

Robinson's claim fails for two reasons. First, the district court clearly understood Booker's holding because it explicitly referred to the Guidelines range as "advisory" in determining Robinson's sentence. Second, the district court's statement regarding its apparent lack of discretion does not appear to refer to its inability to depart downward under the Guidelines because of

their mandatory nature. Rather, that statement reflects the district court's conclusion that after considering all relevant sentencing factors, it could not provide adequate reasoning for imposing a sentence below the advisory Guidelines range. In order to depart downward the district court would have been required to give an express or implied reason for doing so, and it felt it could not do so based on the evidence presented at sentencing. During Robinson's sentencing, the district court remarked that it was troubled by Robinson's belief that this case "was no big deal," his inability to stay out of trouble at home, and his apparently fabricated testimony. Considering these statements in light of the record, see Jimenez-Beltre, 440 F.3d at 519, as well as the district court's characterization of the Guidelines as "advisory," we find no error.

## IV.

For these reasons, we AFFIRM Robinson's convictions and sentence.

**Affirmed**.