MADELEINE M. LANDRIEU, Judge.
| iDefendant, Louis Monroe, appeals his conviction and sentence for aggravated rape. For reasons that follow, we affirm the conviction and' sentence, and remand for the limited purpose of correcting the April 22, 2015 minute entry.

STATEMENT OF CASE

The defendant, Louis Monroe, was charged by grand jury indictment with aggravated rape, a violation of La. R.S. *261 14-.42.[1] A jury found him guilty as charged. The trial court denied defendant’s motions for post-verdict judgment of acquittal and for new trial. Defendant was sentenced to life imprisonment at hard labor without benefit of parole, probation, or suspension of sentence. This appeal followed.

STATEMENT OF FACTS

The defendant and. the victim, D.B., shared a cell on a protective custody tier at Orleans Parish Prison starting in May 2013.[2] Testimony and evidence at trial ^established that on the night of June 21, 2013, the defendant produced a shank with a blade and handle, and ordered D.B. to perform oral sex on him.[3] D.B. was seventeen years of age at the time. He testified that the defendant threatened him by telling him that he would rape him anally and kill him if D.B. did not follow defendant’s order. D.B. testified that he complied with the defendant’s order and performed oral sex on him. The defendant ejaculated and ordered D.B. to brush his teeth.
D.B. testified that when the defendant threatened him, he pleaded with the defendant' not to rape him, but did not call for help from deputies or other inmates. After raping D.B., the defendant told him that he would have to perform oral sex on the defendant every Friday. The defendant later shaved D.B.’s head, eyebrows and chin hair. D.B- said he allowed the defendant to do so because he was afraid to object. D.B. testified that prior to the June 21, 2013 incident, the defendant had joked about raping him.
After the incident, D.B. asked a-captain if he could move to a different cell, but his request was refused.[4] He then asked other inmates if he could sleep in their cells, but did not tell them why he was'requesting to do so. The morning after the rape, D.B. did not report it to any authority figure at the prison or tell any of the other inmates. Several days later, D.B. told another inmate about the rape. After D.B. told the other inmate what happened, D.B, was called into the Special Operations Division of the Sheriffs Office, and gave a statement regarding the incident.
|sAt the time of trial, D.B.; was facing a charge of second degree murder, and had been housed at Orleans Parish Prison since May 2013 because of that charge. D.B. testified that no one in the District' Attorney’s office or the Sheriffs Office asked him to testify against defendant in exchange for leniency with the murder charge pending against him. He also denied conspiring with other inmates to fabricate a rape charge against the defendant. He testified that he was truthful in his trial testimony and in his statement to deputies with the Special Operations Division.
Bryce Caine was incarcerated at Orleans Parish Prison at the time of the incident involving D.B. and the defendant.- ' He testified . that he knew D.B. through his friendship with D.B.’s brother. He described D.B. as fragile and easily manipulated. .He said D.B. and the defendant shared a cell. Caine-recalled a day when he saw deputies remove D.B. from his cell. After seeing this, Caine asked the defen *262 dant what was wrong with D.B., and the defendant told Caine he had forced D.B. to perform oral sex- on him. Shortly after this conversation, deputies- removed the defendant from his cell, and Caine said the defendant did not return to the cell. Caine testified that he saw the shank that the defendant had in his .possession. Caine said another inmate, Gary McGee, was standing-next to him when the- defendant told- him he' forced D.B. to perform oral sex on him.[5] Caine said he did not immediately report his conversation with the defendant to deputies, but he later gave- a statement to Deputy Lance Wade of the Special Operations Division of the Orleans Parish Sheriffs Office.
|4At the time of his statement in June 2013, Caine had prior convictions from 2009 for possession of marijuana and unauthorized use of- a motor vehicle, and was housed in Orleans Parish Prison for a pending charge of armed robbery. In- October 2013-, Caine pled guilty to a lesser charge of first degree robbery. At trial (in Mbrch 2015), Caine testified that he was not offered a plea agreement on the robbery charge in exchange for his testimony at the defendant’s trial. He stated that he was truthful in his testimony at ⅜⅛1 and , in his statement to the Special Operations Division.
Jared Washington was an inmate at Orleans Parish Pinson at the time of the rape. He-admitted to convictions for simple battery, manslaughter, armed robbery, conspiracy to commit armed robbery and obstruction of justice. He testified that he knew both D.B. and the defendant; and said he had a conversation with the defendant after D.B. asked Washington to switch cells with him. The defendant told Washington he threatened D.B. with a shank and forced him to perform oral sex on him. The defendant told Washington he later flushed the shank down the toilet. On the night of the incident, Washington heard grunting noises from-the cell that D.B. shared with the defendant, .but he did not witness a sexual assault. Washington gave a statement to deputies in the Special Operations Division about what the defendant told him about his assault of D.B. In the days after the rape, Washington ’recalled seeing D.B. crying a lot, and noticed that D.B. had-cut his hair and eyebrows.
At the time of his interview with the Special Operations Division, Washington had a charge of second degree murder pending against him. After the interview but before trial, the State amended the second degree murder charge to manslaughter. Washington pled guilty to the manslaughter charge, and balso pled guilty to charges of simple battery, armed robbery, conspiracy to commit armed robbery and obstruction of justice. Washington testified at trial that no one from the District Attorney’s office offered to reduce the murder charge in exchange for his testimony at this trial. He also stated that he was truthful in the statement he gave to the Special Operations Division and in his .testimony at trial..
• G. E., who was-also housed at Orleans Parish Prison at' the time of the rape, testified that he had convictions for forcible rape and sexual battery.[6] He stated that D.B. and the defendant shared a cell, and he knew D.B. to be very naive. He confronted D.B. because he suspected D.B. was washing the defendant’s clothes, which G.E. described as inappropriate prison behavior.' G.E. asked D.B. if he was being mistreated by the defendant. He said he asked D.B. that question because he (G.E.) *263 was raped as a child, and recognized the signs of someone who has been sexually-abused. He said that as D.B. fought back tears, he told .G.E, the defendant, forced him at knifepoint to perform oral sex .on him. D.B. also told G.E, the defendant said D.B. would have to give him oral sex every Friday from that point forward or the defendant would stab him. G.E. reported what D.B. told him to a Captain with the Sheriffs Office, and he gave a taped statement to Deputy Lance Wade.
At the time G.E. gave his taped statement to Deputy Wade, he was facing a charge of.aggravated rape.. Subsequently, in September 2013, he pled guilty to forcible rape and sexual battery. He testified that his statement to Deputy Wade and his trial testimony were truthful, and no one in the -District Attorney’s office offered him a plea deal in exchange for his- testimony in this matter.
IfiAt the time of the incident,- Deputy Lance Wade was a detective with the Special Operations Division Tactical Unit Bureau of Investigations. . On June 27, 2013, he began an investigation regarding allegations of a rape that recently occurred in Orleans Parish Prison in the protective custody tier. He learned from inmate G.E. that D.B. was the victim of the rape. Deputy Wade interviewed D.B., the defendant and several other inmates. During the interview, D.B; appeared very nervous and would not make eye contact with him.' D.B. cried often during the interview. Deputy Wade also interviewed inmates G.E., Bryce Caine, Jaroid Washington, Milton Wilson and Gary McGee.[7] He testified that their statements were consistent with the statement given to him by D.B. Deputy Wade testified that deputies were unable to locate the weapon allegedly used by the defendant when he assaulted D.B. Deputy Wade took a recorded statement from the defendant. The defendant’s statement was played for the jury,
In the recorded interview, defendant asserted that the allegations of rape against him stemmed from a prison fight he had with a “big dude,” but the defendant did not know the name of the “big dude” or his cell number on the tier. The defendant asserted that D.B. shaved his eyebrows as a result of losing a bet on a basketball game, and that D.B. shaved his head because he was converting to the Muslim religion. ' The defendant stated that the inmates on the -tier played homosexual “games” daily, but he denied being gay or having any sexual contact with anyone In the prison. The defendant indicated that he knew D.B.1 would make a rápe "allegation ágainst him. The defendant also asserted that' other inmates " conspired against him becáusé he was a “rat.”
17Peputy Wade testified that he did not advise defendant prior to the interview of the allegation that he forced D.B. to perform oral sex on him. At the interview, the defendant first raised the issue of the allegation of rape being made against him. Deputy Wade’s question to defendant as" to whether he personally had oral or anal sex with any inmate while he was incarcerated occurred after the defendant said that he knew D.B. would make a rape allegation against him. Deputy Wade was unable to corroborate defendant’s assertion that the allegation of rape against him was the result of an altercation with a “big dude” on the lower tier. Deputy Wade was also unable to corroborate allegations of a conspiracy against defendant by other inmates because he was “a rat.” Deputy Wade testified that “a vast majority” of the inmates on the tier where defendant and D.B. shared a cell “are -cooperating with law enforcement,” so investigators *264 were unable to determine who could have singled defendant out as a “rat.” Based on the investigation, Deputy Wade and his partner, Detective Jonathan Griffin, decided to charge defendant with aggravated rape.
Jean Holland was qualified as an expert in the field of sexual assault examination. Ms. Holland is a sexual assault nurse examiner at University Hospital in New Orleans. She testified that she met with the victim in this case, D.B., six days after the assault. Because the examination did not occur until six days after the assault, Ms. Holland did not collect DNA swabs. She spoke with D.B., who told her he was a prisoner at Orleans Parish Prison and that his cellmate, the defendant, had forced him to perform oral sex on him. His cellmate told him he would be forced to do so again every Friday. Ms. Holland said D.B. was distraught and tearful throughout the examination. She saw no signs of physical Istrauma in D.B.’s mouth, but she said she would not expect to find any trauma six days after an assault.
Detective Jonathan Griffin of the Orleans Parish Sheriffs Department testified that he was assigned to the Special Operations Division in June 2013. On June 27, 2013, Detective Griffin and his partner, Deputy Lance Wade, investigated an allegation of a sexual assault that had occurred in the prison six days earlier. They received information about the assault from their ranking officer, who had learned of the allegation from another inmate, G.E. Detective Griffin and Deputy Wade conducted interviews and took statements from the alleged victim, D.B., the defendant and several other inmates who were housed in the same tier as D.B. and the defendant.

ERRORS PATENT

This Court reviews the record for errors patent. See La.C.Cr.P. art. 920(2). The April 22,' 2015 minute entry reflects that the trial court sentenced defendant to a life sentence but does not refleet'that the sentence would be served without the benefit of parole, probation, or suspension of sentence as required by La. R.S. 14:42.[8] However, the April 22, 2015 sentencing transcript evidences that the trial |9court stated that the life sentence was without the benefit of parole, probation, or suspension of sentence. “[I]n cases of a discrepancy between a minute entry and the sentencing transcript, the transcript controls.” State v. Gordon, 2013-0495, p. 12 (La.App. 4 Cir. 7/16/14), 146 So.3d 758, 766. We *265 remand this case to the trial court for the limited purpose of correcting the minute entry to reflect that .the sentence is to be served without benefit of parole, probation or suspension of sentence. See State v. Coleman, 2012-1408, p. 7 (La.App. 4 Cir. 1/8/14), 133 So.3d 9, 17.

DISCUSSION

Defendant’s sole assignment of error is that the trial court erred in denying his motion for a mistrial’ after the State’s rebuttal argument. Thé motion was based on the State’s references to the defendant’s failure to testify at trial and on the fact that two inmates who were interviewed in this investigation did not testify at trial.
The State argues that the defense in its closing argument first directed the jury’s attention to the fact that defendant did not testify by contending .that there was no reason for defendant to take the stand, as his testimony would have been the same as his recorded statement. Additionally, the State argues that the defense also insinuated that two inmates who were interviewed during the investigation were not called by the State to testify because their testimony would have harmed the State’s case. Specifically, the State cites the following remarks in the defendant’s closing argument:
[Counsel for defendant]:
|](⅝1 want to talk about something else Bryce [Caine] said. When I was doing the cross exam with him I said, you know, when Louis Monroe allegedly told you he made [D.B.] suck his penis, you were by yourself. No, Gary McGee was there. And I was like so Gary Magee [sic] was able to hear this. Yes, and the [S]state just' brought that up again. Why isn’t Gary McGee, he is one of the five people that was interviewed, according to the interview that — according to the State were consistent. Why isn’t McGee, why wasn’t he called? There is no corroboration on any of this. Each person that says Louis told them that he made [D.B.] suck his penis — no one can back that up. So you are just stuck with people’s words. There is no corroboration in this entire case, anywhere. So that was an opportunity to bring McGee in and say, yeah I was there too. So that is two people that are in the same place where he is saying he said that. The State didn’t bring him here.
* ⅜ *
. Now let’s talk a little bit about Magee [sic] and Milton Wilson. Now I know I already touched .on that but I will be quick with this. So those were two recorded interviews of people you did not hear from. Why weren’t they [sic]? Did they say, “I am not going to [cooperate?” I am not going to say what I originally said. We don’t know, but [what] we do know is that the [Sítate didn’t call them. That they didn’t get up here and say something that was consistent, which the [S]tate is very proud of and thinks consistency means truth. Then why wouldn’t they just call them? And do you remember during voir dire we talked 'about if we’d go into the gravy of questions like; I’m just not sure, but why didn’t we hear this? There were two other recorded interviews. Why didn’t we hear those? This is where you have to look for that, right here. Those were [S]tate witnesses, that’s where you have to look. You should be concerned about why you didn’t hear from them.
⅝ ⅜ ⅝
There is nothing in Louis • Monroe’s statement, no admission, no confession. There is nothing in there that should *266 make you think he- committed, [sic] I don’t know if the State is going to try and say that. It just wasn’t in there. It was him willingly sitting down saying I didn’t do this. I am glad you got to hear what he had to say. There was no reason for him to take the stand and talk to you. They played a thirty, thirty-five minute statement, His own words.
(emphasis added).
|nIn portions of the State’s rebuttal argument quoted below, counsel referred to inconsistencies in the defendant’s recorded statement. Counsel for the State noted that defendant first said that D.B. offered to perform oral sex on him and defendant responded by telling D.B. to get out of the cell. The defendant later said in his recorded statement that if D.B. had been giving him oral sex, he would have wanted to keep D.B. in the cell with him. The State’s rebuttal argument also referred to comments made in the defense’s closing argument regarding the two inmates who gave statements to deputies but did not testify at trial.
Specifically, defendant objected to the following remarks made by the State in its rebuttal argument:
[Counsel for the State:]
So, why would you reject him if you said you would keep him there in the cell? It doesn’t make any sense. None of the statement makes sense and they said oh, the [S]tate played the recorded statement, which was great for us. Because there was no need for him to take the stand. I bet not. I bet not. Because I can assure you there is no way he could have stuck to that story from start to finish. And there is no way they were going to let him take the stand in an effort -to do so, because the statement goes in one hundred million directions.
[Counsel for defendant]:
Judge, I must object to the State commenting on whether the defendant takes the stand or not. He has the right not to testify.
THE COURT:
Sustained, Counselor.
[Counsel for the State]:
Everybody knows he doesn’t have to take the stand, we talked about that in voir dire he has a fifth amendment right, just like the defense attorney told you. That they are the ones who said in closing arguments, they said, the State played the tape so he didn’t even have to take the stand. Great news for us. Thank the Lord that happened because there is no way, no way, that statement, that taped statement 11⅞⅛ true and can be corroborated a second time without further questioning.
Now, we want to talk about there being five recorded interviews of people being consistent. Ladies, and gentlemen, I can’t comment to the reason why the [S]tate didn’t call two particular witnesses. Now, the defense, after the [S]tate said the [S]tate rests, the judge said, defense, defense calls Milton Wilson. Did you hear that?
[Counsel for defendant]:
Judge, objection, burden shifting.
THE COURT:
Sustained. Sustained, Counselor.
[Counsel for the State:]
Again, defense has no burden, ladies and gentlemen. They don’t have to call any witnesses. But ask yourself logically, if these witnesses[-]
THE COURT: '
Counselor, let me just stop you along that lines, [sic] I sustained the objection. [Counsel for defendant]:
Thank you, Judge.
*267 [Counsel for the State]:
Ladies and gentlemen, let’s put it this way, the deputy testified that the witnesses, correct? [sic] All witnesses that gave statements to the deputies were consistent....
The State also reiterated, “[n]ow, I am not here to say the defense has to do anything, everybody understands that the defense has no burden.”
Following the State’s rebuttal argument, the defendant moved for a mistrial, which the trial court denied. Defendant argues that despite the fact that he had no burden of proof at trial, the State’s rebuttal argument implied that defendant should 1 13not have testified on his own behalf because it would have hurt his defense, and defendant should have called witnesses that the State did not call. Defendant further argues that the trial court failed to admonish the State, and did not advise the jury to disregard the prejudicial statements.
La.C.Cr.P. art. 770 governs mistrials and provides:
Upon motion of a defendant, a mistrial shall be ordered when a remark or comment, made within the hearing of the jury by the judge, district attorney, or a court official, during the trial or in argument, refers directly or indirectly to:
(1) Race, religion, color or national origin, if the remark or comment is not material and relevant and might create prejudice against the defendant in the mind of the jury;
(2) Another crime committed or alleged to have been committed by the defendant as to which evidence is not admissible;
(3) The failure of the defendant to testify in his own defense; or
(4) The refusal of the judge to direct a verdict.
An admonition to the jury to disregard the remark or comment shall not be sufficient to prevent a mistrial. If the defendant, however, requests that only an admonition be given, the court shall admonish the jury to disregard the remark or comment but shall not de-cláre'a mistrial.
La.C.Cr.P. art.'774, which governs scope of argument, provides:
The argument shall be confined to evidence admitted, to the lack of evidence, to conclusions of fact that the state or defendant may draw therefrom, and to the law applicable to the case.
The argument shall not appeal to prejudice. ;
The state’s rebuttal shall be confined to answering the argument of the defendant.
It is well-settled that “[m]istrial is a drastic rémedy that is only authorized where substantial prejudice will otherwise result to the defendant”, and “[t]he determination of whether prejudice has resulted lies within the sound discretion of the trial court.” State v. Tillman, 2010-1717, p. 5 (La.App. 4 Cir. 9/28/11), 74 So.3d 761, 764. “The mere possibility of prejudice is insufficient to warrant a mistrial.” State v. Simms, 2013-0575, p. 20 (La.App. 4 Cir. 6/18/14), 143 So.3d 1258, 1270. Thus, mistrial' “should only be used when substantial prejudice to- the defendant is shown.” Simms, 2013-0575, pp. 19-20, 143 So.3d at 1270 (quoting State v. Castleberry, 98-1388, p. 22 (La.4/13/99), 758 So.2d 749, 768).
“A trial court has broad discretion in controlling, the scope of closing arguments.” State v. Jones, 2015-0123, p. 44 (La.App. 4 Cir. 12/2/15), 182 So.3d 251, 280 (citing State v. Webb, 2013-0146, pp. 26-27 (La.App. 4 Cir. 1/30/14), 133 So.3d 258, 275-276, writ denied, 2014-0436 *268 (La.10/3/14), 149 So.3d 793, cert. denied sub nom., Webb v. Louisiana, — U.S. -, 135 S.Ct. 1719, 191 L.Ed.2d 689 (2015)). Likewise, “[a] trial judge has broad discretion in granting a motion for mistrial and should not be granted unless the defendant demonstrates a clear showing of prejudice.” State v. Merwin, 2015-0681, p. 22 (La.App. 4 Cir. 1/27/16), 186 So.3d 759, 771 (citing State v. Leonard, 2005-1382, p. 11 (La.6/16/06), 932 So.2d 660, 667). “Comment on the defendant’s failure to take the stand at trial is a trial error, not a structural defect in the proceedings, that has been subject to harmless-error analysis at the federal level since Chapman v. California, 386 U.S. 18, 87 S.Ct. 824, 17 L.Ed.2d 705 (1967).” State v. Thomas, 2005-2373, p. 1 (La.4/17/06), 926 So.2d 490, 491; see also State v. Roe, 2013-1434, p. 25 (La.App. 4 Cir. 10/8/14), 151 So.3d 838, 855, writ denied, 2014-2355 (La.8/28/15), 175 So.3d 966, writ granted in part and denied in part on other grounds, 2014-2322 (La.8/28/15),177 So.3d 125 (same).
In State v. Bailey, 2012-1662, pp. 7-8 (La.App. 4 Cir. 10/23/13), 126 So.3d 702, 707, this Court recognized:
11sHowever, prosecutors have wide latitude in choosing closing argument tactics. State v. Casey, 99-0023, p. 17 (La.1/26/00), 775 So.2d 1022, 1036; [State v.] Jackson, 2008-0286, p. 10-11 [ (La.App. 4 Cir. 4/29/09)], 11 So.3d [524] at 533. Further, a trial court has broad discretion in controlling the scope of closing arguments. Casey, supra; State v. Jones, 2010-0018, p. 9 (La.App. 4 Cir. 11/10/10), 51 So.3d 827, 833. Even in the' case of a prosecutor exceeding the bounds of proper argument, a reviewing court will not reverse a conviction unless thoroughly convinced that the argument influenced the jury and contributed to the verdict. State v. Wiltz, 2008-1441, p. 6 (La.App. 4 Cir. 12/16/09), 28 So.3d 554, 558; State v. Harvey, 2008-0217, p. 4 (La.App. 4 Cir. 5/13/09), 12 So.3d 496, 499. Even where the prosecutor’s statements are improper, a reviewing court should accord credit to the good sense and fairmindedness of the jurors who heard the evidence. Harvey, supra.
Additionally, in State v. Simms, 2013-0575, pp. 21-22 (La.App. 4 Cir. 6/18/14), 143 So.3d 1258, 1271-72 (emphasis added), this Court recently recognized that when the State indirectly references a defendant’s failure to testify, the intended effect of the comment on the jury must be determined, and the context of the statements are crucial:
In State v. Mitchell, 2000-1399 (La.2/21/01), 779 So.2d 698, the Louisiana Supreme Court held when the prosecutor makes an indirect reference to the defendant’s failure to take the stand and testify, a reviewing court must inquire into the remark’s intended effect on the jury in order to distinguish indirect references to the defendant’s failure to testify (which are impermissible) from general statements that the prosecution’s case is unrebutted (which are permissible). Id. at pp. 4-5, 779 So.2d at 701 (citing State v. Johnson, 541 So.2d 818, 822 (La.1989); State v. Fullilove, 389 So.2d 1282, 1284 (La.1980); State v. Jackson, 454 So.2d 116, 118 (La.1984)). “In order to support the granting of a mistrial, the inference must be plain that the remark was intended to focus the jury’s attention on the defendant’s not testifying.” Id. at p. 5, 779 So.2d at 701 (citing State v. Smith, 327 So.2d 355, 362 (La.1975) (on rehearing); State v. Reed, 284 So.2d 574, 576 (La.1973); State v. Howard, 262 La. 270, 263 So.2d 32 (1972)). The context of indirect reference is therefore crucial to whether the statement is permissible.
*269 The Louisiana Supreme Court further explained that an indirect reference to the failure to testify that mandates the granting of a mistrial occurs where the focus is on the accused’s failure to testify, such as when he is the only witness who can rebut the state’s evidence. However, if another witness who could have testified on the accused’s fybehalf exists, the indirect reference does not focus on the accused’s failure to testify, and a mistrial is not warranted. Mitchell, 2000-1399, p. 5, 779 So.2d at 701-702 (citing State v. Perkins, 374 So.2d 1234, 1237 (La.1979); Fullilove, 389 So.2d at 1284; State v. Harvill, 403 So.2d 706, 711 (La.1981); State v. Jackson, 454 So.2d 116, 118 (La.1984); State v. Smith, 433 So.2d 688, 697 (La.1983); State v. Latin, 412 So.2d 1367, 1363 (La.1982)). The Louisiana Supreme Court also noted that [statements in argument to the effect, that there is no refuting evidence does not constitute an impermissible reference to the defendant’s failure to testify. Mitchell, 2000-1399, p. 5, 779 So.2d at 702 (citing State v. Reed, 284 So.2d 574, 576 (La.1973) and State v. Cryer, 262 La. 575, 263 So.2d 895 (1972)).
(emphasis added).
In support of his argument that the State made flagrantly improper remarks that require mistrial, defendant cites two cases from the United States Sixth Circuit Court of Appeals: State v. Stover, 474 F.3d 904 (6th Cir.2007), and United States v. Carroll, 26 F.3d 1380 (6th Cir.1994). Both cases are distinguishable from the instant case in that the prosecutorial misconduct complained of in those cases did not include a' reference to a defendant’s failure to testify or present witnesses at trial. Defendant also cited a case from -the United States First Circuit Court of Appeals, U.S. v. Robinson, 473 F.3d 387 (1st Cir.2007), for the test to determine the flagraney of the prosecutor’s remarks. The Robinson case also did not involve a prosecutor’s comment on a defendant’s failure to testify at trial or present witnesses. ■
The State relies in part upon this Court’s decision in Roe, 2013-1434, p. 23-24, 151 So.3d at 854, wherein the State commented that one of the defendants could have taken the stand to testify regarding his eyesight after the defense, in closing, pointed out that the defendant was wearing glasses at trial. The defense objected and moved for a mistrial after the jury retired to deliberate. This Court found that although the trial court erred in denying the defendant’s request for a | ^mistrial, the trial court immediately sustained the objection “and essentially admonished the jury that [the defendant] ‘had no obligation to take the witness stand. None whatsoever.’ ” Id. .Additionally, as noted above, this Court recognized that “comment on a defendant’s failure to take the stand is a trial error, not a structural defect in the proceedings, and such error is subject to harmless error analysis.” Id. at p. 25, 151 So.3d at 855.
The Roe Court noted the State’s argument that defense counsel, in closing argument, “referred to both defendants as being afraid to ‘take the stand.’ ” Id. at p. 26, 151 So.3d at 855. Accordingly, this Court .concluded that “[considering' the strong evidence of [the defendant’s] guilt, together with his counsel’s acknowledgement to the jury in closing argument that his client did not ‘take the stand’ because of his prior record,” together with the jury’s knowledge of the fact that both defendants were residents of a federal halfway house, the defendant failed to show that he was substantially prejudiced by the eyesight comment, “which obviously was directed at rebutting defense counsel’s closing argument concerning [the defen *270 dant] wearing glasses in court.” Id. Thus, the error was harmless because the jury’s verdict was “surely unattributable to such error.” Id. (quoting State v. Robertson, 2006-1537, p. 9 (La.1/16/08), 988 So.2d 166, 172).
■ The State also relies on this Court’s decision- in Bailey, supra, ■ wherein the defendant argued that prosecutorial commentary regarding the failure of the defense to call the defendant’s mother and employer as witnesses suggested that the defendant had the burden of proof. However, this Court found that “these comments were proper as they merely rer stated evidence or lack thereof that was presented during the trial.” State v. Bailey, 2012-1662, p. 16, 126 So.3d at 713.
’ |1sThe State also cites State v. Bowman, 95-0667, p. 5 (La.App. 4 Cir. 7/10/96), 677 So.2d 1094, 1097, wherein the prosecutor stated'• during rebuttal that “we talked about’"the right that every defendant has that he doesn’t have' to take the stand in his own defense ... [b]ut what we didn’t talk about were .-.. [victim’s rights to 'be free from getting shot in the back.” This Court determined that the remark was an indirect reference to the defendant’s failure to testify, as’ the prosecutor was focused on the victim’s, rights and “not intended to focus the jury’s attention on the defendant’s failure to testify.” Bowman, 95-0667, p. 6, 677 So.2d at 1097. The Bowman Court further found that any error was harmless because the record did not evidence that the jury was influenced by the remark, nor did the record evidence that the remark contributed to the verdict. Bowman, 95-0667, p. 7, 677 So.2d at 1098.
In Simms, 2013-0575, p. 20, 143 So.3d at 1270-71, the defendant argued that the trial court erred in denying his motion for a mistrial when the State made the following statements in rebuttal:
I’m telling you [sjhe’s mistaken. I’m telling you he’s innocent.- You know who got on the stand and said that, who said that he’s innocent, that[ ] she’s mistaken? Nobody. The only person that came in her [sic] and told you that is this defense attorney. And let’s be perfectly clear on something, ladies and gentlemen. . What I say is not evidence. What Ms. Parker [the other assistant district attorney] says is not evidence, and what they [the defense] have to say is not evidence. You have zero 'evidence of this man’s innocence. Now, he wants to stand up here and talk about what he’s saying and what he wants to talk about. And you know what’s real funny? From the beginning of this trial throughout this entire trial he hasn’t spoken once about why in the world—
This Court found that it was “apparent that the ‘he’ in which the State references in the last sentence is defense counsel, not the defendant.” Simms, 2013-0575, p. 20, 143 So.3d at 1271. Because the remark was not a direct preference to the defendant’s failure to testify, “[t]he next issue [wa]s whether the State’s remarks constitute® an indirect reference to the defendant’s failure to testify.” Simms, 2013-0575, p. 21, 143 So.3d at 1271. The Simms Court concluded that the State’s rebuttal “was not intended to focus the jury’s attention on the defendant’s failure to testify because he [wa]s not the only witness that could rebut the State’s evidence against him,” as three witnesses testified on behalf of the defendant, and “the State’s comments] in rebuttal were not an indirect reference to the defendant’s failure to testify such that it would entitled [sic] him to a mistrial.” Id. at p. 22, 143 So.3d at 1272. This Court found that “[furthermore, the State’s rebuttal seem[ed]- to be responding to the statements made by defense counsel in closing argument,” wherein the defense “claimed that the case was about identifl- *271 cation, and because the State had no physical evidence that proved the defendant was guilty, it had to establish identification beyond a reasonable doubt” and “discussed the alleged inconsistencies in the victim’s testimony concerning the defendant’s appearance.” Id. at p. 23, 143 So.3d at 1272. Therefore, because “the State was referring to the absence of evidence to support defense counsel’s claims and the fact that statements made by defense counsel [we]re not evidence,” the State’s remarks “d[id] not constitute an impermissible indirect reférence to thé defendant’s failure to testify.” Id. at pp. 23-24, 143 So.3d at 1272.[9]
In this case, we find that the State’s comments in rebuttal were not intended to focus the jury’s attention on the defendant’s failure to testify, but rather were |gnintended to focus attention on the incoherent nature of defendant’s recorded statement and the State’s contention that it “goes in one hundred million directions.” Additionally, defendant’s assertions in his recorded statement that D.B. shaved his eyebrows because he lost a bet on a basketball game and shaved his head because he was converting to the Muslim religion were directly controverted by D.B.’s testimony at trial. As previously noted, defendant’s assertions that there had been an altercation with a “big dude” and that other inmates conspired against defendant because he was a “rat” were also uncorroborated. Thus, it was not “plain that, the remark was intended to focus the jury’s attention on the defendant’s not testifying.” Simms, 2013-0575, p. 21, 143 So.3d at 1271.
Furthermore, the State did not make the reference to defendant’s failure to take the stand until rebuttal, and the reference was in response to the defense’s closing remarks that “[tjhere was no reason for [defendant] to take the stand and talk to you” because the State “played a thirty, thirty-five minute statement. [Defendant’s] own words.” This Court has recognized that “[i]n rebuttal closing argument, the State has the right to answer the arguments of defendant.” State v. Baudier, 2000-1108, p. 7 (La.App. 4 Cir. 5/23/01), 789 So.2d 696, 703 (citing La. C.Cr.P. art. 774; State v. Adams, 98-2062 (La.App. 4 Cir. 8/4/99), 752 So.2d 186).
With regard to defendant’s argument that the State suggested that defendant should have called witnesses, the State was likewise responding, in rebuttal, to defendant’s counsel’s statement that the State failed to call Gary McGee or Milton Wilson to testify. The State was permitted to respond to the defendant’s | ^argument. See Baudier, supra. Likewise, the State’s reference to the failure to present witnesses “merely restated evidence or lack thereof that was presented during trial.” Bailey, 2012-1662, p. 16, 126 So.3d at 713. We find no error on the part of the trial court for denying the motion for mistrial. The prosecutor’s comments on rebuttal were in'direct response to comments' made by defense counsel in closing argument.
*272 Furthermore, even if we were to find error, “where a prosecutor exceeds the bounds of proper argument, a reviewing court will not reverse a conviction unless thoroughly convinced that the argument influenced the jury and contributed to the verdict.” Jones, 2015-0123, p. 44, 182 So.3d at 280; see also Simms, 2013-0575, p. 24, 143 So.3d at 1273. In this case, we are not thoroughly convinced. The testimony and evidence presented by the State supported the jury’s guilty verdict. Considering the “strong evidence” of defendant’s guilt, we find the jury’s verdict “was surely unattributable to the prosecutor’s comment.” Roe, 2013-1434, p. 26, 151 So.3d at 855.

CONCLUSION

For the foregoing reasons, we find the trial court did not abuse its discretion in denying defendant’s motion for a mistrial. Accordingly, we affirm defendant’s conviction and sentence. However, we remand the case to the trial court with instructions to correct the April 22, 2015 minute entry to comply with the transcript and reflect that the sentence is to be served without benefit of parole, probation or suspension of sentence.
AFFIRMED AND REMANDED

. The crime in this case occurred in 2013. "The offense of aggravated rape was renamed first degree rape" by the 2015 amendment to La. R.S. 14:42.

. To protect the victim’s identity, we will not use his name or nickname in this opinion, but will instead refer to him by his initials. See La. R.S. 46:1844(W).

. A shank is a prison term for a knife-like weapon.

. D.B. did not give the name of the captain to whom this request was made.

. Gary McGee did not testify at trial.

. We will refer to G.E. by his initials due to the sensitive nature of his testimony.

. Wilson and McGee did not testify at trial.

. On June 21, 2013, the date of the incident, La. R.S. 14:42 was entitled "Aggravated Rape” and provided, in pertinent part:
A. Aggravated rape is a rape committed upon a person sixty-five years of age or older or where the anal, oral, or vaginal sexual intercourse is deemed to be without lawful consent of the victim because it is committed under any one or more of the following circumstances:
(1) When the victim resists the act to the utmost, but whose resistance is overcome by force.
(2) When the victim is prevented from resisting the act by threats of great and immediate bodily harm, accompanied by apparent power of execution.
(3) When the victim is prevented from resisting the act because the offender is armed with a dangerous weapon.
(4) When the victim is under the age of thirteen years. Lack of knowledge of the victim’s age shall not be a defense.
(5) When two or more offenders participated in the act.
(6) When the victim is prevented from resisting the act because the victim suffers from a physical or mental infirmity preventing such resistance.
[[Image here]]
D. (1) Whoever commits the crime of aggravated rape shall be punished by life im- ■ prisonment at hard labor without benefit of parole, probation, or suspension of sentence. [emphasis added]

. In State v. Woodfork, 2007-1396, p. 3 (La.App. 4 Cir. 3/19/08), 981 So.2d 717, 719, during the State’s rebuttal, the prosecutor stated that cocaine "came from that defendant” and "[t]here [wa]s no evidence put on by the Defense that he did not possess cocaine.” The defense objected, and the trial court sustained the objection. On appeal, the defendant argued that the statement was a comment on his failure to testify, and the trial court erred in- not declaring a mistrial. This Court found that the statement was not an indirect reference to the defendant’s failure to testify warranting a mistrial because there was another witness who could have testified on the defendant’s behalf. Additionally, the defendant did not request a tnistrial’.'